[Cite as *State v. Artis*, 2019-Ohio-2070.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,              CASE NO.  8-18-40

      v.

TYRELL E. ARTIS,

                             **O P I N I O N**

      DEFENDANT-APPELLANT.

---

Appeal from Logan County Common Pleas Court
Trial Court No. CR 18-05-0140

**Judgment Affirmed**

Date of Decision:   May 28, 2019

---

APPEARANCES:

    *David E. Stenson* **for Appellant**

    *Alice Robinson-Bond* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Tyrell E. Artis ("Artis"), appeals the August 21, 2018 judgment entry of sentencing issued by the Logan County Court of Common Pleas, General Division, journalizing his conviction by a jury on one count of Domestic Violence and one count of Abduction, and sentencing him to serve an aggregate prison term of sixty months.

*Procedural History*

{¶2} On May 8, 2018, the Logan County Grand Jury returned a two count indictment against Artis alleging that he committed one count of Domestic Violence, in violation of R.C. 2919.25(A),(D)(4), a felony of the third degree, and one count of Abduction, in violation of R.C. 2905.02(A)(2), (C), a felony of the third degree. The charges stemmed from a physical altercation that Artis had with his live-in girlfriend, during which he was alleged to have prevented her from leaving their home by grabbing her by the throat and strangling her, headbutting her, and then throwing her down to the ground. Artis entered a plea of not guilty to the charges.

{¶3} On June 14, 2018, the State requested a subpoena for the victim, Megan Kaeck, to appear at trial. On June 29, 2018, the State filed a "Motion in Limine as to Forfeiture by Wrongdoing," requesting that the trial court declare Megan an unavailable witness and permit "the State to introduce any and all of the victim's

written statements or verbal statements made to law enforcement or others, and the photos of her injuries that she provided contemporaneous to such statements, if she should fail to appear for trial." (Doc. No. 30).

{¶4} In support of its motion, the State claimed that it had obtained audio recordings from calls Artis made to Megan while in jail as well as audio recordings from visitations at the jail between the two. The State claimed the content of the calls indicated Artis had repeatedly suggested to Megan that if she refused to comply with the subpoena and failed to testify at trial the State would be forced to dismiss the charges against him for a lack of evidence. The recordings further indicated that Artis and Megan had devised "a plan" to that effect. The State argued that "[s]hould the victim fail to appear at court, that failure to appear would be due to the wrongdoing of the Defendant for the purpose of preventing her from attending or testifying." (Doc. No. 30). The State requested that Megan's out-of-court statements be found admissible under Evid.R. 804(B)(6), if she failed to appear at trial pursuant to the State's subpoena.

{¶5} On July 19, 2018, the case proceeded to a jury trial. The State brought to the trial court's attention that Megan had failed to appear at trial and that it had also received confirmation from Megan's mother that Megan was indeed refusing to appear. The State renewed its motion to have Megan's statements to her mother

and law enforcement be introduced at trial under the Evid.R. 804(B)(6) exception to the hearsay and confrontation clause rules.

{¶6} Outside the presence of the jury and prior to opening statements, the trial court conducted a pre-trial hearing on the State's motion to declare Megan unavailable and to introduce her statements under the "forfeiture by wrongdoing rule." The State introduced the audio recordings from the jail between Artis and Megan, which took place in May and June of 2018, through the testimony of Officer Andrew Purk of the Bellefontaine Police Department who verified that the calls were made to a phone number associated with Megan, and who also recognized Megan's and Artis' voices on the recordings. The trial court concluded the State proved "by a preponderance of the evidence that [Artis] colluded with [Megan] to not appear and respond to a properly-served subpoena." (Tr. 143-44). Accordingly, the trial court found Megan to be an unavailable witness and concluded that her statements to her mother and law enforcement were admissible at trial under Evid.R. 804(B)(6).

{¶7} At trial, the State presented the testimony of Megan's mother, April Kaeck. Ms. Kaeck's testimony established that Megan and Artis were in a romantic relationship and lived together in the same home on April 21, 2018. Ms. Kaeck stated that she saw Megan the next day and observed the injuries to Megan's face and neck. Megan also sent her mother pictures of her injuries prior to meeting with

her that day so her mother would not "freak out" when she saw her. Ms. Kaeck also took her own photos of Megan's injuries. (Tr. at 172). Each of these photos, which were admitted as exhibits at trial, depicted abrasions on Megan's neck and face as well as "a big goose egg" above Megan's eye with significant bruising also forming around the eye. (Tr. at 180). Megan told Ms. Kaeck that Artis had choked and headbutted her, before throwing her on the couch. Ms. Kaeck recalled contacting Artis about the incident and that Artis apologized. She further stated that later that week Megan decided to move out and file a report with the police.

{¶8} The State also presented the testimony of law enforcement who authenticated the jail recordings and who initially took Megan's complaint against Artis relating to the domestic violence incident at the home they shared. One officer testified to the statements Megan made at the time she filed the report. Specifically, Megan had stated that Artis grabbed her by the arm, preventing her from leaving the room and choked her. Megan further told the officer that once Artis stopped choking her, he then headbutted her causing injury to her face above her eye.

{¶9} In his defense, Artis presented the testimony of his sister, Ashia Artis, in an attempt to cast doubt on the credibility of Megan's statements. The jury returned guilty verdicts on both the Domestic Violence and Abduction counts.

{¶10} On August 21, 2018, Artis appeared for sentencing. The State presented evidence of Artis' lengthy criminal history, including two prior

convictions for Domestic Violence, and evidence of the fact that Artis was on postrelease control when he committed the underlying offenses. The trial court also addressed the issue of merger and concluded that Artis committed the offenses with a separate animus and thus the convictions were not allied offenses of similar import subject to the doctrine of merger. The trial court imposed a prison term of thirty-six months upon Artis for the Domestic Violence conviction and a twenty-four month prison term for the Abduction conviction, and ordered the prison terms to run consecutively for a total state prison term of sixty months.

{¶11} Artis filed this appeal from the trial court's August 21, 2018 judgment entry of conviction and sentence, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED IN DECLARING MEGAN KAECK TO BE AN UNAVAILABLE WITNESS AND IN FAILING TO ENFORCE HER SUBPOENA, THEREBY DEPRIVING APPELLANT OF HIS RIGHTS UNDER THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, ARTICLE 1, SECT. 10 OF THE OHIO CONSTITUTION, CONSTITUTIONAL DUE PROCESS, AND HIS RIGHT TO FAIR TRIAL.**

**ASSIGNMENT OF ERROR NO. 2**

**APPELLANT WAS DENIED HIS CONSTITUTIONALLY PROTECTED RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL.**

## ASSIGNMENT OF ERROR NO. 3

## THE TRIAL COURT ERRED IN FAILING TO MERGE THE DOMESTIC VIOLENCE AND ABDUCTION COUNTS CONTAINED IN THE INDICTMENT.

## ASSIGNMENT OF ERROR NO. 4

## THE TRIAL COURT ERRED IN FAILING TO PROVIDE A COMPLETE JURY INSTRUCTION.

## ASSIGNMENT OF ERROR NO. 5

## THE CUMULATIVE EFFECT OF THE FOREGOING ERRORS DENIED APPELLANT OF A FAIR TRIAL.

*First Assignment of Error*

{¶12} In his first assignment of error, Artis claims that the trial court erred in declaring Megan an unavailable witness and permitting the State to introduce hearsay statements Megan made to her mother and to law enforcement under the "forfeiture by wrongdoing" rule. Specifically, Artis claims that the State failed to introduce sworn testimony demonstrating that Megan was indeed unavailable and that the trial court improperly refused to enforce the subpoena to compel Megan's attendance despite its knowledge of her location on the date of trial.

*Legal Standard*

{¶13} The Sixth Amendment to the U.S. Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The United States Supreme Court has

held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

{¶14} Thus, according to *Crawford*, the initial analysis to be made in determining whether a defendant's right to confrontation has been violated by the admission of out-of-court statements that are not subject to cross-examination "is not whether [the statements] are reliable but whether they are testimonial in nature." *Toledo v. Sailes*, 180 Ohio App.3d 56, 2008-Ohio-6400, ¶ 13 (6th Dist.), citing *Crawford* at 61. To determine whether a statement is testimonial or nontestimonial, we inquire whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the case. *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, paragraph two of the syllabus. While testimonial statements under *Crawford* are not subject to the exceptions to the hearsay rules, they may nevertheless be admissible under one of the two historical exceptions to the Confrontation Clause recognized by the U.S. Supreme Court—forfeiture by wrongdoing and dying declarations. *State v. Carter,* 8th Dist. Cuyahoga No. 106462, 2018-Ohio-3671, citing *Giles v. California*, 554 U.S. 353 (2008).

**{¶15}** Ohio Rule of Evidence 804(B)(6) codifies the forfeiture by wrongdoing rule and reads:

> **(B) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:**
>
> > **(6) Forfeiture by Wrongdoing. A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying. However, a statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest the admissibility of the statement.**

**{¶16}** In using the forfeiture by wrongdoing exception, the State must show by a preponderance of the evidence: (1) the defendant's wrongdoing resulted in the witness's unavailability and (2) one purpose was to cause the witness to be unavailable at trial. *State v. Henderson*, 7th Dist. Mahoning No. 16 MA 0057, 2018-Ohio-5124, ¶ 22; *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶¶ 84, 87, 90. The State need only show the defendant's wrongdoing which caused the witness's unavailability "was motivated in part by a desire to silence the witness." *Hand*, *supra*, at ¶¶ 84, 90 (a defendant can have various purposes, and the state need not show the defendant's sole motivation was to eliminate the victim as a potential witness). In making the admissibility decision, a court is not bound by the rules of evidence. Evid.R. 104(A) (except rules on privilege). Although evidentiary decisions on hearsay are typically reviewed for an abuse of discretion, courts are

instructed to "review de novo evidentiary rulings that implicate the Confrontation Clause." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97.

*Evidence of Wrongdoing*

{¶17} As previously mentioned, the record reflects that prior to the presentation of evidence in the case, the trial court held a brief hearing, outside the presence of the jury, on the State's motion to admit Megan's hearsay statements under Evid.R. 804(B)(6) when Megan failed to comply with the State's subpoena and appear at trial.[1] The State informed the trial court that it had personally served Megan with the subpoena at a pre-trial conference on June 25, 2018 and provided a copy of the signed subpoena to the trial court.

{¶18} In support of its motion seeking to admit Megan's statements under Evid.R. 804(B)(6) the State offered the testimony of Officer Andrew Purk with the Bellefontaine Police Department who identified Megan's phone number on the call logs from the jail and recognized Artis' and Megan's voices on the jail recordings. The State played specific excerpts of the recorded conversations to demonstrate that Artis colluded with Megan to devise a plan that Megan not comply with the subpoena to appear at trial. The recorded conversations demonstrate that Artis and Megan were under the impression that if Megan did not testify, the charges against Artis would be dismissed.

---

[1] As already discussed, the State provided notice to Artis of its intention to introduce Megan's statements on June 29, 2018, approximately three weeks prior to the trial.

{¶19} For instance, on June 17, 2018, during a conversation between Artis and Megan, Artis discussed his upcoming trial and stated that he would refuse the plea bargain of six years. Artis also speculated that the charges could be dismissed, "it can go either way. * * * if not we'll see them on July 19th. Or I will. Hope you don't." Megan responds, "I'm not going." (Tr. 123, Ex. 10). On June 19, 2018, in another recorded conversation between Artis and Megan, Artis stated "They're about to drop this shit, I'm telling you right now. They're about to drop it." Artis continues, "I ain't stressing about this case." Megan responds, "I am." Artis replied confidently, "As long as everything goes as planned. There's nothing to worry about I'm coming home." (Tr. 124, Ex. 10). Artis then addressed Megan in the third person.[2] "As long as Megan doesn't let these Motherfuckers talk her into, or threatening her or scaring her into coming to court—" Megan interjected, "she's not." Artis continued, "—then it's going to be good. Then it'll all be good." Megan reassured, "she's not." (Id.). Artis stated, "She just makes me a little nervous sometimes. Just because I know, I know what type of games these Motherfuckers be trying to play. They try, they did that to my, the victim of my last number, threaten to take her kids if she didn't show up to trial." (Id.).

---

[2] It was explained at trial that Megan had an identical twin sister named Deidre, whose identification Megan used to pass through jail security to visit Artis. Because Megan was the victim in the case, Artis was not permitted to visit with her at the jail or to speak with her on the phone. The couple circumvented this rule by Megan using Deidre's I.D. to enter the jail facility. Artis also began calling a phone number associated with Megan's twin, once Artis was blocked from calling Megan's number from the jail. Periodically, the couple would refer to Megan in the third person during their conversations, seemingly aware that the conversations were being recorded and while attempting to keep up with the ruse.

{¶20} In a subsequent call on June 26, 2018, a day after Megan was served the subpoena, the two discussed whether she would comply with the subpoena. Megan stated that she told the prosecutor she wanted the State to dismiss the case against Artis, but the prosecutor refused. Artis said to Megan "they are not going to have no choice but to dismiss the whole thing if you don't get up on that stand and say what they want you to say." (Tr. 126, Ex. 10). In a later conversation during Megan's visitation at the jail, Artis inquired about "the plan" and again referred to Megan in the third person and expressed his doubt that "they'd even arrest her for not going to fucking court." Megan replied, "that's why I'm changing my report." (Tr. 128, Ex. 10). Artis commented "that's a good plan—great plan." Later in the conversation Artis said "if she doesn't show up to court, they don't have a case. We'll be alright, baby, I promise." (Id.). Megan expressed reservations about potentially going to jail as a consequence of ignoring the State's subpoena and Artis told her, "I promise you, babe, I bet they don't. Just trust me. If you do you'll get out for work release. All you got to do is get a letterhead from your job stating that you work there from your boss. And you should already have that, I'd get that ASAP. Just a letterhead and I don't know if you should have your schedule. Just a letterhead from your job that's basically what you need. * * * Just have that in your purse or something." (Id.).

**{¶21}** After hearing the excerpted recorded conversations, the trial court concluded the State had satisfied its burden in proving by a preponderance of the evidence that Artis encouraged Megan not to comply with the subpoena and colluded with her to refuse to appear at trial. Specifically, the trial court found the tone of the conversations was "very manipulative" and that Artis engaged in wrongdoing sufficient to trigger the application of Evid.804(B)(6). However, before permitting the trial to proceed with the State presenting Megan's out-of-court statements under Evid.R. 804(B)(6), the trial court attempted to locate Megan to compel her compliance with the State's subpoena.

*Unavailability*

**{¶22}** This leads us to the gravamen of Artis' argument on appeal, which pertains to whether the trial court properly deemed Megan to be an unavailable witness before allowing the State to present evidence at trial under Evid.R. 804(B)(6). The record reveals that upon learning that Megan failed to appear at trial on July 19, 2018 at 8:00 a.m., as stated in the State's subpoena, the trial court found Megan in contempt of court and directed the Sheriff's Office to locate her. The trial court stated that its "preference would be that the defendant have the opportunity to cross-examine that witness and have testimony rather than the—than the 804(B)(6) issue to become an issue." (Tr. at 119). The trial court also implored the State to

go to "Herculean efforts to find her" and encouraged Artis' trial counsel to contact her "to the extent that the defense has any ability to reach her." (Id. at 153).

{¶23} Upon reconvening the proceedings in the afternoon on July 19, 2018, and outside the presence of the jury, the trial court explained that it learned Megan had been located in Tiffin, Ohio, more than an hour away from where the trial was taking place, and that she continued to refuse to comply with the subpoena. The trial court weighed its options on how to proceed. It indicated that law enforcement could not arrest her because the paperwork had not yet been completed to effectuate the arrest warrant. The trial court noted that the jury has been sworn and seated, and the trial was ready to take place, with both of the State's witnesses prepared to testify to Megan's statements. The trial court determined that it was not going to further delay the trial because Artis had colluded with and encouraged Megan to ignore the State's subpoena.

{¶24} Ohio Rule of Evidence 804(A)(2) defines a person as unavailable when she "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Evid.R. 804(A)(2). Artis argues that the trial court was required to "enforce the State's subpoena" before finding Megan unavailable. (Appt. Br. at 12). Artis suggests that the trial court was required to continue the proceedings and arrest Megan instead of applying Evid.R. 804(B)(6). However, in order for an declarant to be deemed unavailable

under Evid.R. 804(A)(2), "the rule requires the court to 'attempt to compel' a witness to testify." *State v. Holt*, 10th Dist. Franklin Nos. 11AP-748, 11AP-749, 2012-Ohio-2326, ¶ 21, quoting *State v. Issa*, 93 Ohio St.3d 49, 59 (2001).[3]

**{¶25}** Here, the record established the lengths the trial court took to attempt to compel Megan to testify, by finding her in contempt and directing law enforcement to locate her when she failed to appear at trial. Once Megan was found, she persisted in her refusal to comply with the State's subpoena. The trial court determined that the conservation of judicial resources and economy outweighed further delaying the trial to preserve Artis' rights under the Confrontation Clause when the State had already proven by the requisite standard of proof that Artis had engaged in wrongdoing to obstruct the judicial proceeding and therefore had forfeited that right.

**{¶26}** Notably, such a consideration by the trial court is clearly contemplated by Evid.R. 804(B)(6), which codifies this common law principle. *See State v. Hand*, 107 Ohio St. 3d 378, 2006-Ohio-18, ¶ 105 (stating "*Crawford* explicitly preserved the principle that an accused has forfeited his confrontation right where the accused's own misconduct is responsible for a witness's unavailability); *Crawford*

---

[3] In *Holt*, the trial court attempted to compel the declarant to testify before finding him unavailable by reminding him that his plea bargain required him to testify and that it indicated that if he refused to testify, the prosecutor could reinstate the murder charge he faced before his plea bargain. The declarant repeatedly refused to testify and, in fact, he indicated that he was "going to refuse to testify no matter what." The Tenth Appellate District found "[u]nder these circumstances, the trial court did not abuse its discretion or commit plain error when it found [the declarant] unavailable." *State v. Holt*, 10th Dist. Nos. 11AP-748, 11AP-749, 2012-Ohio-2326, ¶ 21

*v. Washington*, 541 U.S. 36, 43 (2004)("The rule of forfeiture by wrongdoing extinguishes confrontation claims on essentially equitable grounds; it does not purport to be alternative means of determining reliability."); *see*, *also*, *Reynolds v. United States* (1879), 98 U.S. 145, 158 (if a witness is unavailable because of the defendant's own misconduct, "he is in no condition to assert that his constitutional rights have been violated").

**{¶27}** Similarly, in *State v. Harper*, which also involved the admission of the victim's out-of-court statements to law enforcement under Evid. 804(B)(6), the victim in *Harper* had been in a relationship with the appellant, and despite a no contact order, the appellant initiated 197 phone calls from jail to the victim, two of which she had accepted. *Harper*, 6th Dist. Lucas No. L-15-1310, 2017-Ohio-1395, ¶ 18. The appellant also asked others to contact the victim on his behalf, with the instruction that she not cooperate with the prosecution of this case. *Id*. The "[a]udio from one such 'jail house' call (Exhibit 8) revealed appellant asking another man ('C') to 'make sure she don't come;' 'Just stay on her bro;' 'Call her, and text her;' 'If she don't show up two times, they going to throw this shit out;' 'give her the guidelines;' and 'no face, no case.' " *Id*. Despite being properly served with a subpoena by the State, the victim failed to appear on the first day of trial and the trial court permitted the investigating detective to testify to statements the victim made implicating the appellant's culpability in the crime charged. *Id*. at ¶ 7.

{¶28} On appeal in *Harper*, the appellant challenged the trial court's declaration of the victim as unavailable. The Sixth Appellate District affirmed the trial court's unavailable ruling under Evid.R. 804(A)(5), which states that a person also is "unavailable," if she "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." *Harper*, 2017-Ohio-1395, ¶ 27. Likewise, the record establishes that similar circumstances are present in this case for the trial court to also find Megan unavailable under Evid.R. 804(A)(5).

{¶29} For the reasons stated, we find that the record establishes a sufficient basis for the trial court to find Megan unavailable and therefore we find no error in its determination.[4] Moreover, we also conclude that the record supports the trial court's determination that Artis' wrongdoing—i.e., the manipulation he exerted on Megan based upon their relationship at the time to persuade her not to comply with the State's subpoena—resulted in her unavailability on the day of trial and, as evidenced by the recorded phone conversations, Artis conducted these conversations in this regard with the purpose to pressure Megan and cause her to be unavailable at trial. Accordingly, we overrule the first assignment of error.

---

[4] Artis also argues that the trial court erred in finding Megan unavailable because State was required to present sworn testimony demonstrating her unavailability, which Artis claims the State failed to do. In support of this proposition, Artis directs us to cases which either predate the adoption of Evid.R. 804(B)(6) or simply involve the issue of unavailability, without the added component of the defendant's proven wrongdoing in procuring the declarant's absence at trial. Thus, we find the cases relied upon by Artis to be distinguishable and not instructive.

Case No. 8-18-40

*Second Assignment of Error*

**{¶30}** In his second assignment of error, Artis claims that his trial counsel was ineffective when counsel asked for the CD of the recorded conversations between Megan and Artis collected from the jail to be given to the jury during its deliberation of the verdict, which was permitted by the trial court.

*Legal Standard*

**{¶31}** To prove an allegation of ineffective assistance of counsel, Artis must satisfy a two-prong test. First, Artis must establish that his trial counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. To demonstrate that counsel's performance was deficient, the defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *State v. Canada*, 10th Dist. Franklin No. 14AP-523, 2015-Ohio-2167, ¶ 89; *State v. Murphy*, 91 Ohio St.3d 516, 524 (2001) ("To prevail on such a claim, a defendant must show that counsel's actions were professionally unreasonable."). In doing so, the defendant must overcome the strong presumption that counsel's

performance was adequate or that counsel's actions might be considered sound trial strategy. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 180.

**{¶32}** Second, Artis must demonstrate that he was prejudiced by counsel's performance. *Strickland*, 466 U.S. at 687. To show that he has been prejudiced by counsel's deficient performance, Artis must prove that, but for counsel's errors, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. Conjectural evidence—predictions about what evidence could possibly be without a basis in the record—does not support a showing of prejudice to establish a claim of ineffective assistance of counsel. *Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590, ¶ 35.

**{¶33}** The failure to make either the deficiency or prejudice showing defeats a claim of ineffective assistance of counsel. *State v. Frye*, 10th Dist. Franklin Nos. 14AP-988, 14AP-989, ¶ 11, citing *Strickland* 466 U.S. at 697. Thus, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland* at 697.

*Discussion*

**{¶34}** At trial, the State presented testimony from Corporal Robin Bailey explaining the phone and visitor policies at the Logan County jail. Corporal Bailey discussed phone records obtained from Artis' inmate personal identification number or PIN that indicated he had made approximately 175 phone calls to Megan while housed at the jail. Eventually, a block was placed on Megan's number, denying Artis' access to the phone number because Artis was not permitted to contact Megan due to the fact that she was the victim in the case. Soon after, another number appeared on Artis' call log which the record indicates was the number of Megan's identical twin sister.

**{¶35}** The testimony before the jury further made reference to a CD compiled by law enforcement that contained audio recordings of the conversations between Megan and Artis over the phone and while she visited him at the jail. This exhibit was identified as Exhibit 10 during Corporal Bailey's testimony and again was referenced by Officer Andrew Purk in his testimony to the jury, during which he identified the voices of Artis and Megan on the audio recordings.[5] In front of the jury, Officer Purk also summarized content of the conversations on the CD pertaining Artis' and Megan's discussion of a "plan" to ensure Megan did not appear at trial to testify against Artis.

---

[5] It should be noted that Exhibit 10 was admitted as an exhibit immediately before the commencement of the trial during the trial court's hearing on the State's motion to admit Megan's statements under Evid.R. 804(6).

**{¶36}** After the presentation of the evidence and before the trial court instructed the jury, the parties discussed the admission of exhibits outside the presence of the jury. At this time, defense counsel requested that Exhibit 10 be admitted as evidence in the jury trial.[6] (Tr. at 257). With no objection from the State, the trial court admitted Exhibit 10. (Id. at 258). During their deliberations, the jury submitted a written question asking to listen to Exhibit 10. The trial court discussed this issue on the record with parties. The following exchange occurred:

> **Trial Court: All right. The Court has received another question. And I think this was a bit of—this is not a surprise to me. "Could we please—" and then the word is view—"Exhibit 10, the jail call CD." That I think would imply listen because we know its audio, not video. We sent Exhibit 10 in for a reason. It was your request, [Defense Counsel], that that went in at all.**
>
> **Defense Counsel: Yes.**
>
> **Trial Court: I presume you have no exception to their listening to Exhibit 10.**
>
> **Defense Counsel: No, Your Honor, I expected that.**
>
> **Trial Court: Anything from the State?**
>
> **Prosecutor: Your Honor, it includes a number of jail calls, not necessarily just the ones that were testified to, so I don't know if you want to restrict it in any way or they get free rein of everything. It includes, stuff about his prior felony convictions and includes stuff about, you know, all kinds of thing [sic] that I think are a problem.**

---

[6] We note that the record contains a typographical error and refers to "Exhibit 19" in two instances where the record clearly indicates that the admission of Exhibit 10 was being discussed. Given the fact there was no Exhibit 19 identified or discussed at trial, we can reasonably infer the court reporter mistakenly typed "19" instead of "10" in these instances. (Tr. at 257-58).

**Trial Court:  So do you want to limit it to the ones testified about today?**

**Defense Counsel:  How would we do that?**

**Trial Court:  Well, the way is they listen to these it's under the supervision of the court reporter, so we have a good idea of which—I mean my notes reflect the dates and the specific recordings that were referenced.  I did note that there were a number of them that you did not even open.**

**Prosecutor:  Your Honor, that was in the pretrial motion hearing.  As far as during the testimony, we didn't refer to a specific jail call.  We just talked about "did you listen to the jail calls and did they say this," so I don't know how that affects the case.**

**Trial Court:  Well, the—I appreciate your—I hope you are not complaining that they're going to hear too much.**

**Prosecutor:  No.  My concern—**

**Trial Court:  My concern is that they're going to hear things that you wouldn't want them to hear.**

**Defense Counsel: I think that's dogs on the porch I think they know he's been to prison.  I'm not too concerned about that.[7]**

**Prosecutor:  I don't recall everything that's on those jail calls and I don't know if the officer does.  I don't know what's in there.  It's Pandora's box, Your Honor.**

**Defense Counsel:  I have no problem.**

**Trial Court: Have you listened to all of them?**

---

[7] During her testimony at trial, Megan's mother discussed a conversation with Artis, in which he mentioned the fact that he was on "probation" at the time of the altercation with Megan and that he had been to prison before.  We shall address this issue in more detail in subsequent paragraphs as this particular testimony is the subject of the Fourth Assignment of Error.

> **Defense Counsel:** I've reviewed the transcripts and the transcripts are part of the first hearing.[8]
>
> **Prosecutor:** But you indicated, for instance, that one of the ones we had on there you didn't have a transcript of.
>
> **Defense Counsel:** The first one I don't have any transcript of.
>
> **Trial Court:** But that one was introduced. That one they can play in its entirety. The rest of them you reviewed and you're satisfied the content is not—is not prejudicial?
>
> **Defense Counsel:** My client has indicated he wants them to listen to the whole thing.

(Tr. at 307-309). Thereafter, the jury was permitted to listen the entire collection of audio recordings contained in Exhibit 10 under the supervision of the court reporter.

**{¶37}** On appeal, Artis contends that his defense counsel was ineffective for seeking to have Exhibit 10 admitted and given to the jury in its entirety. Specifically, Artis now claims that the audio recordings contained non-relevant and extraneous content, which included vulgar language used by Artis and his reference to prior bad acts. Thus, Artis contends that the probative value of the recordings was outweighed by its prejudicial effect, and further asserts that since the jury specifically asked for the CD "it can be reasonably inferred that it was highly relevant to the jury's decision to convict." (Appt.Br. at 17).

---

[8] Defense Counsel is referring to "transcripts" of the audio recordings that his assistant made to help him prepare for trial. There is no indication that these "transcripts" were admitted as evidence in the pre-trial hearing on Evid.R 804(B)(6).

{¶38} At the outset we note that a reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98 (1985). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington*, 466 U.S. 668, 689. It is clear from the record that trial counsel's request to have the entire contents of Exhibit 10 given to the jury was trial strategy. The record further indicated that Artis may have wanted the jury to hear the full contents of the CD, because it provided him an opportunity to have certain information he might have perceived to be unfavorable to the prosecution or any alleged coercive tactics by law enforcement in this case or any similar type of case, to be heard by the jury without him having to personally testify and be subject to cross-examination or impeachment.

{¶39} Even though it now appears that Artis is second guessing his counsel's trial tactics, it is well-established that debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524. Moreover, despite Artis' current claims on appeal that permitting the jury to listen to the contents of the CD were prejudicial to his case, we are unwilling to speculate from the record before us that the outcome of the trial would

have been different had trial counsel not requested that the jury be able to listen to Artis' statements on Exhibit 10. Accordingly, we conclude that Artis has failed to substantiate his claim of ineffective assistance of trial counsel on this basis and therefore we overrule the second assignment of error.

*Third Assignment of Error*

**{¶40}** In his third assignment of error, Artis claims that the trial court erred when it failed to merge his convictions for Domestic Violence and Abduction at sentencing. Specifically, Artis argues that the two offenses were committed as a continuous act with a single state of mind, and therefore the trial court erred when it determined that his conduct comprising the two offenses were of dissimilar import.

*Legal Standard*

**{¶41}** "A defendant bears the burden of proving that the offenses for which he has been convicted and sentenced constitute allied offenses of similar import." *State v. Johnson*, 3d Dist. Allen No. 1-16-41, 2017-Ohio-6930, ¶ 13, quoting *State v. Campbell*, 12th Dist. Butler No. CA2014-06-137, 2015-Ohio-1409, ¶ 18. Additionally, a reviewing court may look to the information contained in the record to make its allied offense determination. *Johnson*, at ¶ 13. An appellate court then reviews *de novo* the question of whether offenses are allied offenses of similar import. *State v. Potts*, 3d. Dist. No. 5-16-03, 2016-Ohio-5555, ¶ 93.

{¶42} Section 2941.25 of the Revised Code prohibits the imposition of multiple punishments for the same criminal conduct, and provides that:

**(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

**(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

{¶43} In determining whether offenses are allied, courts are instructed to consider three separate factors: the conduct, the animus, and the import. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. Convictions do not merge and a defendant may be sentenced for multiple offenses if any of the following are true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus. *Id*. at ¶ 25. Two or more offenses of dissimilar import exist "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id*. at paragraph two of the syllabus.

{¶44} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff*, 143 Ohio

St.3d 114 at ¶ 26. As a result, this analysis "may result in varying results for the same set of offenses in different cases." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 52. When determining whether multiple offenses merge pursuant to R.C. 2941.25, a court must review the entire record. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶ 24. The burden is on the defendant to establish his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act. *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 14.

*Discussion*

{¶45} The evidence at trial revealed the following about Artis' conduct constituting the two offenses. Megan's written statement to the Bellefontaine Police dated a week after the incident was admitted under the trial court's Evid.R. 804(B)(6) ruling. In this statement, Megan described the altercation with Artis on the night of April 21, 2018 at the home that they shared.

> **Everything started Friday April 20, 2018. Tyrell kept telling me he would be home soon. He also knew I had to work Saturday April 21, 2018 and needed him to watch my son. Well he never came home. I broke up with him Friday night and told him not to come home Saturday. I got off work Saturday evening 4-21-18 he was there, asked why he didn't come home, he got caught cheating and he got mad. That's when he grabbed me, choked me, and headbut [sic] my right eye. Took me almost a week to report because I was scared. As of Thursday 4-26-18 I moved out and called my landlord 4-27-18 told him what happened and asked to take my name of [sic] the lease as soon as possible, which he is taking care of.**

(Ex. 1).

**{¶46}** At trial, Officer Purk also recalled the statements Megan made at the time she completed her written statement. Specifically, he testified Megan "stated that when she had mentioned him cheating on her, he became extremely angry and agitated. She stated that when she attempted to leave the room, Mr. Artis grabbed her by the arm, pulled her back into the room, had grabbed her by the throat, and choked her for some time." (Tr. at 221). Officer Purk further elaborated on the stand that Megan "said she was so scared and didn't know what to do, what was going on. She said it could have been five to ten seconds or five to ten minutes." (Id.). Officer Purk continued, Megan "stated once he stopped choking her he still has [sic] a hold of her throat, headbutted her, walked out of the room." (Id. at 221-22).

**{¶47}** The indictment charged Artis with Domestic Violence, in violation of R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."[9] R.C. 2919.25(A). Artis was also charged with Abduction, in violation of R.C. 2905.02(A)(2), (C), which states "[n]o person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person under circumstances that create a risk

---

[9] We also note that Artis was found guilty of Domestic Violence in violation of R.C. 2919.25(A),(D)(4), due to his two prior convictions for Domestic Violence, which were stipulated to by the parties at trial.

of physical harm to the victim or place the other person in fear." R.C. 2905.02(A)(2), (C).

**{¶48}** At sentencing, the trial court determined Artis had committed the offenses of Abduction and Domestic Violence and that the two acts were committed independently with a separate animus. The trial court found that Artis committed the offense of Abduction when he restrained Megan's liberty by preventing her from leaving the room and held her by the throat and choked her. At that point, the trial court determined the Abduction was complete. Artis then committed the offense of Domestic Violence when he headbutted Megan causing injuries to her face.

**{¶49}** In our review, we conclude that the record supports the trial court's determination that Artis separately committed the Abduction and Domestic Violence offenses. As such, we find no error in the trial court's decision not to merge the convictions for sentencing purposes. Accordingly, Artis' third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶50}** In his fourth assignment of error, Artis argues that the trial court erred when it gave an inadequate curative instruction to the jury. At trial during the testimony of April Kaeck, Megan's mother, the prosecutor asked about Ms. Kaeck's conversation with Artis after the April 21, 2018 incident with Megan.

> **Prosecutor: Did he have anything else to say to you when you spoke with him?**

**Ms. Kaeck:** He just kept saying it wouldn't happen again and he knew that I wanted Megan to make a report and he didn't want her to because he is on probation and he would go back to prison.

**Defense Counsel:** Your Honor, can we approach.

**Trial Court:** Yeah.

THEREUPON, the Court and counsel confer out of the presence and hearing of the jury as follows:

**Defense Counsel:** She can't talk about that. It's a mistrial.

**Trial Court:** She's going to start talking about his prior convictions, isn't she?

**Defense Counsel:** It's not the same thing. You have—there's a certain way you do that. That's not the way you do it. That's not even what he went to prison for. He didn't go for domestic violence.

**Trial Court:** He made a statement. She's reporting what it is. I mean, you want some sort of admonition to the jury that they're to disregard what he said—

**Defense Counsel:** Yes.

**Trial Court:** Do you want to give me a specific statement? Because you want me—it's almost like the unringing [sic] of the bell problem. You want me to stir it up some more, it's just going to get worse.

**Defense Counsel:** They already heard it, judge. I want the record to be clear.

**Trial Court:** Okay. Tell me what you want to me to say to them.

**Defense Counsel: They're to disregard any discussion of the defendant's prior criminal record as it doesn't relate to this offense.**

**Prosecutor: Your Honor, that's not entirely true.**

**Trial Court: That isn't true. That is an inaccurate statement because it is going to come in. How about just an instruction that says they're to disregard the comments—the defendant's comments about going back to prison.**

**Defense Counsel: Okay.**

**Prosecutor: Would it be better to say going to prison so that they don't—I mean, she mumbled it. They might not have caught the back part.**

**    IN OPEN COURT:**

**Trial Court: Ladies and gentlemen, you are instructed to disregard the statement that the defendant is alleged to have made with respect to going to prison or back to prison. Just disregard that. You may continue.**

(Tr. at 194-96). Artis maintains on appeal that the trial court's failure to also address the mention of "probation" in its curative instruction to the jury was error. Curative instructions have been recognized as an effective means of remedying errors or irregularities that occur during trial. *State v. Williams*, 8th Dist. Cuyahoga No. 94242, 2010-Ohio-5484, ¶ 21. A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge. *State v. Henderson*, 39 Ohio St.3d 24, 33 (1988).

{¶51} We note at the outset that the parties had stipulated to Artis' prior convictions for Domestic Violence, as reflected in the following jury instruction:

> **Evidence is all of the testimony received from the witnesses and the exhibits admitted during the trial and any facts agreed to or stipulated by counsel and any facts which the Court requires you to accept as true. Those stipulations—I will deal with them once again, but the defense has stipulated that Mr. Artis has previously been convicted of domestic violence in two separate cases. And those are essential elements of the current crime.**

(Tr. at 284). Notably, Exhibits 12 and 14, which were admitted as evidence for the jury to review, were judgment entries of conviction issued by the Bellefontaine Municipal Court stating that Artis had been convicted of Domestic Violence in two prior cases.

{¶52} In light of the parties' stipulation regarding Artis' prior convictions and the admission of the audio recordings of the jail conversations with Megan, during which Artis discusses his prior prison sentence and which the record indicates was admitted at his insistence, we cannot find that the trial court's curative instruction materially prejudiced Artis or interfered with his right to a fair trial.

{¶53} Based on the transcript excerpt above, Artis also apparently accepted the curative instruction at the time, rather than moving for a mistrial. Under the invited error doctrine, appellant cannot now raise an error that he himself invited or induced the trial court to make. *Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 313 (1987). Thus, we find that Artis has failed to demonstrate how he was

prejudiced so as to render the trial court's curative instruction inadequate. The fourth assignment of error is overruled.

*Fifth Assignment of Error*

**{¶54}** In his fifth assignment of error, Artis claims that the cumulative effect of all errors at trial deprived him of a fair trial.

**{¶55}** The cumulative error doctrine provides that a conviction may be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial[,] even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15. Because Artis has not demonstrated that multiple errors occurred, the cumulative error doctrine does not apply. Accordingly, the fifth assignment of error is overruled.

**{¶56}** Based on the foregoing, the assignments of error are overruled and the judgment entry of conviction and sentence is affirmed.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**