[Cite as *State v. Smith*, 2022-Ohio-4687.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  4-21-10

      v.

LOREN R. SMITH, JR.               O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Defiance County Common Pleas Court
Trial Court No.  19 CR 13522

Judgment Affirmed

Date of Decision:  December 27, 2022

APPEARANCES:

      *Catherine Meehan* **for Appellant**

      *Russell R. Herman* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Loren R. Smith, Jr., appeals the August 30, 2021 judgment of sentence of the Defiance County Court of Commons Pleas. For the reasons that follow, we affirm.

## I. Facts & Procedural History

{¶2} On March 27, 2019, the Defiance County Grand Jury indicted Smith on the following four counts: Count One of operating a vehicle while under the influence of alcohol ("OVI") in violation of R.C. 4511.19(A)(1)(a) and (G)(1)(e), a third-degree felony; Count Two of aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) and (B)(1)(a), a second-degree felony; Count Three of vehicular assault in violation of R.C. 2903.08(A)(2)(b) and (C)(2), a third-degree felony; and Count Four of failure to stop after an accident in violation of R.C. 4549.02(A)(1)(a) and (B)(2)(b), a fourth-degree felony. On April 3, 2019, Smith appeared for arraignment and pleaded not guilty to the counts of the indictment. The matter eventually proceeded to a jury trial beginning on June 28, 2021.

{¶3} At trial, Casey Huepenbecker testified that on the morning of March 7, 2019, he was driving west along Ohio State Route 18 when he noticed an eastbound white Ford F-150 move to pass another vehicle. (June 28, 2021 Tr. at 280). Huepenbecker stated that the F-150 entered the westbound lane of travel, successfully overtook the other vehicle, and put at least two or three car lengths

between itself and the passed vehicle. (June 28, 2021 Tr. at 280). He testified that he did not see a deer or any other obstruction in the roadway. (June 28, 2021 Tr. at 280). Huepenbecker testified that he thought the F-150 was going to move back into the eastbound lane of travel, but when he realized the F-150 was still coming at him head-on, he swerved to avoid a collision. (June 28, 2021 Tr. at 280). Huepenbecker's efforts were not entirely successful, and the F-150 struck the left front and side of Huepenbecker's vehicle, causing Huepenbecker's vehicle to roll several times. (State's Exs. 1-4). Huepenbecker sustained a number of injuries in the collision, including several severely herniated disks and broken vertebrae, which Huepenbecker testified still cause him constant pain and limit his range of motion. (June 28, 2021 Tr. at 288-291). Huepenbecker stated that the crash occurred sometime between 5:50 a.m. and 5:55 a.m. (June 28, 2021 Tr. at 279).

{¶4} Huepenbecker, a former army medic, testified that once his vehicle came to a stop, he conducted a "blood sweep" to determine whether he had sustained any serious injuries. (June 28, 2021 Tr. at 281, 283). Huepenbecker stated that on finding that he was not bleeding severely, he left his own vehicle to check on the driver of the F-150. (June 28, 2021 Tr. at 283). According to Huepenbecker, when he got to the F-150, there was no one inside of the truck and he did not see anyone in the surrounding area. (June 28, 2021 Tr. at 283). Huepenbecker stated that he did not see anyone exit the F-150, and he could not identify its driver. (June 28,

2021 Tr. at 291-292). Regarding the F-150, Huepenbecker testified that it was dirty inside and that there were cans on the floorboard and on the seat, but he could not identify the type of cans he observed. (June 28, 2021 Tr. at 284).

{¶5} Sergeant Trooper Michael McClain of the Ohio State Highway Patrol ("OSHP") testified that he was dispatched to the scene of the crash at approximately 6:01 a.m. on March 7, 2019, and arrived at approximately 6:08 a.m. (June 28, 2021 Tr. at 128, 146). Sergeant McClain stated that on arrival, he learned that the driver of the F-150 had fled from the scene of the crash. (June 28, 2021 Tr. at 128). According to Sergeant McClain, he then entered the F-150, where he noticed that the airbag had deployed. (June 28, 2021 Tr. at 135). Sergeant McClain stated that he also noticed a soft-sided cooler, inside of which he discovered seven full cans of Natural Ice beer. (June 28, 2021 Tr. at 133). The cans were cold to the touch. (June 28, 2021 Tr. at 133). Sergeant McClain further testified that he saw additional empty cans among the trash and other clutter inside of the F-150. (June 28, 2021 Tr. at 147).

{¶6} Sergeant McClain stated that a canine unit was called to the scene of the crash in an attempt to locate the driver of the F-150. (June 28, 2021 Tr. at 129). David Stecher, formerly a canine handler for the Defiance County Sheriff's Office, testified that his canine tracked the scent of the F-150's driver from the scene of the crash and down a long driveway located off State Route 18. (June 28, 2021 Tr. at

187, 189). Stecher stated that the scent was lost toward the end of the driveway and that he failed to locate the driver. (June 28, 2021 Tr. at 189-190). Stecher testified that he spoke to Sarah Bennett, the occupant of the house at the end of the driveway, who told him she had not seen anyone but that she had seen an unfamiliar white car drive down the driveway, turn around, and speed off. (June 28, 2021 Tr. at 190). Bennett herself confirmed that she saw the car in her driveway, though she testified she did not see anyone getting in or out of the car nor did she see any of the car's occupants. (June 28, 2021 Tr. at 196-197, 201). Bennett stated she saw the car between 7:00 a.m. and 7:30 a.m., that the car was there for approximately 30 seconds, and that she talked to Stecher not long after the car left. (June 28, 2021 Tr. at 196-197, 200-201).

{¶7} For a variety of reasons, including explaining the significance of the white car in Bennett's driveway, the State introduced the statement of Renee Mast, Smith's girlfriend. Although subpoenaed by the State to testify at Smith's trial, Mast failed to appear as required. The State moved to have Mast's statement admitted as the statement of an unavailable witness, arguing that Smith had procured Mast's unavailability when, during a phone call from jail, he "aggressively confront[ed]" her "about how she need[ed] to keep [her testimony] simple and plead the Fifth." (June 28, 2021 Tr. at 205). Finding that Smith had procured Mast's unavailability, the trial court admitted Mast's statement over Smith's objection.

{¶8} Sergeant Benjamin Moser of the Defiance County Sheriff's Office supplied the background for Mast's statement. Sergeant Moser testified that on March 15, 2019, he pulled over Mast's vehicle for a traffic infraction. (June 28, 2021 Tr. at 211). He stated that he knew Mast "operated a white Buick, and that was one of the vehicles that was mentioned, a white car, had picked [Smith] up from the crash scene." (June 28, 2021 Tr. at 211). Sergeant Moser stated that Smith was in the car with Mast and that Mast said she did not feel comfortable talking to him with Smith present. (June 28, 2021 Tr. at 212). Accordingly, Sergeant Moser took Mast to the Sheriff's Office, where she gave her statement. (June 28, 2021 Tr. at 212). Mast's written statement provided:

> [Smith] called me earlier, 5:15ish, that morning of the 7th. He needed a ride to work. I didn't understand why his mom wasn't taking him. I picked him up off of the backroad he was walking to work. I thought he was still drunk from the night before he did smell like it. So I didn't ask any questions, thought him and his mom got into it thats [sic] why she didn't take him. Thought he stayed at his grandparents. He never told me. I took him to work and droped [sic] him off and went to work later that day at 11 a.m. Just two days ago one of his friends stopped over and they were talking and [Smith] got real angry and then I started listing [sic] and thats [sic] how I found out about the accident.

(State's Ex. 13). In response to a question posed by Sergeant Moser, Mast clarified, "[Smith] called me around 5:15ish and picked him up about 5:30. I pulled into the driveway." (State's Ex. 13). In addition, answering Sergeant Moser's question about what Smith and his friend were talking about when Smith got angry, Mast stated, "When they went to the back room his friend then did say everyone knows

about what happened.  His friend said that he would of [sic] just hit the deer instead of went [sic] left of center." (State's Ex. 13).

{¶9} Although the canine track did not locate the driver of the F-150, Sergeant McClain soon identified a suspect.  Sergeant McClain testified that the F-150 was registered to Tim Grime, but that when he contacted Grime, Grime informed him that the F-150 was being used by his son-in-law, John Pratt.  (June 28, 2021 Tr. at 136-137).  Sergeant McClain stated that Pratt came to the OSHP post at around 9:10 a.m. to talk about the F-150.  (June 28, 2021 Tr. at 137).  According to Sergeant McClain, although Pratt confirmed that he usually drove the F-150, he stated that he was not in possession of the F-150 on March 7, 2019.  (June 28, 2021 Tr. at 279).  Sergeant McClain testified that Pratt told him that he had arranged for Smith to fix the F-150's clutch and that Smith had taken possession of the truck approximately one week prior to the crash.  (June 28, 2021 Tr. at 137).

{¶10} For his part, Pratt stated at trial that he did not have possession of the F-150 on March 7, 2019, and that he did not have any keys to the truck at that time. (June 28, 2021 Tr. at 260).  Pratt confirmed that he had arranged for Smith to fix the F-150 along with another person, Lucas Manley.  (June 28, 2021 Tr. at 251).  He testified that approximately one week before the crash, the F-150 had been taken to Smith's grandfather's workshop, and he stated that he had not seen the truck since about March 5, 2019.  (June 28, 2021 Tr. at 252-253, 255).  Lyle Smith ("Lyle"),

Smith's grandfather, testified that the F-150 had been in his workshop for 13 days prior to March 7, 2019, and that he had last seen the F-150 in his workshop on the evening of March 6, 2019, when he and his wife were leaving for church. (June 28, 2021 Tr. at 223-225). He stated that, before he left for church, he had seen Smith alone in the shop working on the F-150 and that Smith told him the truck would be removed from the shop that evening. (June 28, 2021 Tr. at 226). Lyle testified that he told Smith that he should not be driving the F-150 because his license was suspended, to which Smith replied that he would not be driving the truck and that someone else was coming to get it. (June 28, 2021 Tr. at 226). Lyle stated he did not see anyone drive the F-150 off his property and that he did not see the F-150 again after he left for church, though he was not certain whether the truck was still there when he and his wife returned that evening. (June 28, 2021 Tr. at 225-226).

{¶11} Having learned the F-150 had been entrusted to Smith, as well as that Smith's driver's license was suspended and that Smith had a prior felony OVI, Sergeant McClain focused his attention on Smith. (June 28, 2021 Tr. at 138). Sergeant McClain, as well as OSHP Trooper Adam Foster, went to talk to Smith at the Gardenscape facility in Archbold—Smith's place of employment. (June 28, 2021 Tr. at 139, 177). Sergeant McClain and Trooper Foster arrived at the Gardenscape facility at 11:06 a.m. on March 7, 2019. (June 28, 2021 Tr. at 139, 177). Sergeant McClain testified that he made contact with Wayne Dobson, the

Gardenscape plant manager, who initially told him that he had taken Smith to work that morning. (June 28, 2021 Tr. at 139). However, Sergeant McClain stated that, when pressed, Dobson retracted his statement and admitted he had not given Smith a ride to work as he usually did. (June 28, 2021 Tr. at 279). According to Sergeant McClain, Dobson said that Smith had not shown up to his residence on the morning of March 7, 2019. (June 28, 2021 Tr. at 139). Dobson confirmed this at trial, testifying that he left for work without Smith on the morning on March 7, 2019. (June 28, 2021 Tr. at 231). Dobson testified that as he was driving to work, Smith called him and asked whether he was still at home. (June 28, 2021 Tr. at 231). According to Dobson, when he told Smith that he had already left for work, Smith told him that he did not need to turn around and that Smith would be at work when he got there. (June 28, 2021 Tr. at 231). A picture of Dobson's cell phone showed that Dobson received phone calls from Smith's cell phone at 5:55 a.m. and 6:02 a.m. on March 7, 2019. (Ex. 12).

{¶12} At the Gardenscape facility, Sergeant McClain and Trooper Foster were directed to a time clock located in a breakroom, where they found Smith's timecard. While Smith's timecard was punched at 5:43 a.m., Sergeant McClain noted that the key had been left in the time clock, and he opined that "anyone could manipulate th[e] * * * time clock." (June 28, 2021 Tr. at 140); (Exs. 10-11). Sergeant McClain testified that Dobson told him that "someone must have already

punched [Smith] in." (June 28, 2021 Tr. at 140). Dobson acknowledged telling Sergeant McClain that someone else must have punched Smith's timecard. (June 28, 2021 Tr. at 236). However, Dobson testified that it was rare for one employee to clock in another employee and that he did not know Smith, or any other Gardenscape employee, to be clocked in when they were not working. (June 28, 2021 Tr. at 236, 238). Dobson further testified that the key was always in the time clock and that someone could use it to open the machine and change the time, though he stated that no one had ever manipulated the time clock as far as he knew. (June 28, 2021 Tr. at 237-239). Dobson had no information definitively indicating that someone had punched in Smith or manipulated the time clock on the morning of March 7, 2019. (June 28, 2021 Tr. at 238-242). Pratt, who also worked at Gardenscape with Smith and Dobson, similarly testified that employees would occasionally clock in other employees but that he had never seen another employee manipulate the time clock. (June 28, 2021 Tr. at 268-269). Sergeant McClain acknowledged that he did not speak to anyone at Gardenscape who said that they had clocked in Smith on the morning of March 7, 2019. (June 28, 2021 Tr. at 149).

{¶13} After examining Smith's timecard, Sergeant McClain and Trooper Foster went to speak to Smith. Sergeant McClain testified that on encountering Smith, Smith smelled like alcohol and "had very red, bloody, glassy eyes, slow speech, [and] * * * a fresher abrasion on his forehead." (June 28, 2021 Tr. at 142,

144). Trooper Foster likewise stated that Smith smelled like alcohol and that his eyes were bloodshot and glassy. (June 28, 2021 Tr. at 168-169). With respect to the abrasion observed on Smith's forehead, Sergeant McClain testified that the mark was "consistent with airbag deployment." (June 28, 2021 Tr. at 142). Sergeant McClain stated that Smith denied that he had been driving the F-150. (June 28, 2021 Tr. at 150).

{¶14} Trooper Foster then administered a horizontal gaze nystagmus ("HGN") test to Smith. According to Trooper Foster, a study showed that in 88 percent of test subjects who exhibited four or more "clues" during an HGN test, their blood alcohol concentrations were found to be .08 or higher. (June 28, 2021 Tr. at 165-166). Trooper Foster described the HGN test, testified that he was trained to administer it, and indicated that the HGN test was administered to Smith in accordance with the procedure he outlined. (June 28, 2021 Tr. at 156-165, 169-170). He stated that Smith exhibited six "clues" during the HGN test, which indicated to him that Smith was under the influence. (June 28, 2021 Tr. at 237-239). Trooper Foster testified that he also administered a vertical gaze nystagmus ("VGN") test to Smith. According to Trooper Foster, VGN "clues" begin to appear when a person's blood alcohol concentration reaches .17. (June 28, 2021 Tr. at 171-172). Trooper Foster testified he did not observe any "clues" when administering the VGN test to Smith. (June 28, 2021 Tr. at 171-172). Trooper Foster opined that,

based on Smith's performance on the HGN and VGN tests, Smith's blood alcohol concentration was "somewhere between .08 and .17." (June 28, 2021 Tr. at 172). Sergeant McClain and Trooper Foster both testified that no additional sobriety testing was performed, including blood or breath testing, and that, to their knowledge, Smith returned to work for the rest of the day after they spoke to him. (June 28, 2021 Tr. at 144, 151, 173-174, 180-181).

{¶15} Dobson and Pratt also testified about their interactions with Smith on the morning of March 7, 2019. Dobson testified that during cold weather, Smith would often begin the workday by going outside and starting fires underneath the machinery to get the conveyor belts started. (June 28, 2021 Tr. at 241-242). According to Dobson, it would take between 30 and 45 minutes for the belts to start running, after which Smith would come inside and begin stacking bags of topsoil. (June 28, 2021 Tr. at 242). However, Dobson offered no testimony concerning whether Smith had started fires on the morning of March 7, 2019. Dobson testified that he first saw Smith at approximately 7:15 a.m. on the morning of March 7, 2019, but that prior to seeing Smith, he had been in the office doing administrative work. (June 28, 2021 Tr. at 235). Dobson stated that Smith did not appear to be intoxicated at work and that he just acted like the "silly guy" he always was. (June 28, 2021 Tr. at 243). Dobson said he had no reason to believe that Smith should be sent home. (June 28, 2021 Tr. at 243).

{¶16} Pratt testified that lighting fires under the conveyor belts was not exclusively Smith's job and that various Gardenscape employees, himself included, would start the fires as needed. (June 28, 2021 Tr. at 258-259, 272). Pratt stated he did not remember personally lighting fires under the conveyor belts on March 7, 2019, and could not recall if anyone lit fires that morning. (June 28, 2021 Tr. at 258, 273). He testified he first saw Smith sometime between 6:35 a.m. and 7:00 a.m. and that Smith "walked in probably like five or ten minutes before [Pratt] had to talk to the state trooper on the phone and they knocked on [Grime's] door at 6:35." (June 28, 2021 Tr. at 261, 267). Pratt, who stated that he got to work before 6:00 a.m., testified that it was unusual for him not to see Smith immediately when he got to work, and he suggested that since he did not immediately see Smith, that meant that Smith was not there when he clocked in. (June 28, 2021 Tr. at 267-268). He stated that when he saw Smith, Smith called him over and "asked [him] if [he] had insurance on the truck." (June 28, 2021 Tr. at 261). Pratt testified that Smith told him "he had swerved to miss a deer and hit a car head on, and he ran from the scene." (June 28, 2021 Tr. at 261). He stated he thought Smith was joking until he received a phone call advising him the F-150 had been involved in a crash. (June 28, 2021 Tr. at 261-262). Pratt testified he could not smell alcohol on Smith when talking to him, but that he "was talking kind of quiet" and "kind of holding himself." (June 28, 2021 Tr. at 266). Pratt described Smith as walking a little bit "funny," but

stated he was not sure why Smith was walking that way and that "it could have been he was walking out of the injury." (June 28, 2021 Tr. at 266-267).

{¶17} Finally, Dobson and Pratt testified about alcohol and drug consumption on Gardenscape's premises, though their testimonies were somewhat contradictory. Dobson testified that Gardenscape employees did not consume alcohol while working. (June 28, 2021 Tr. at 244-245). However, he conceded that employees would drink beers on site after work hours, and he stated that it would not be unusual if there were a picture of an on-site trash can full of beer cans. (June 28, 2021 Tr. at 244). Indeed, Exhibits 11 and 14 depicted a trash can filled with various beer cans underneath the time clock in the Gardenscape breakroom. Pratt agreed with Dobson that the trash can full of beer cans was not unusual for Gardenscape, but contrary to Dobson's testimony, Pratt stated that Gardenscape employees, Smith and himself included, would often drink alcohol during work hours. (June 28, 2021 Tr. at 265-266, 273). Pratt testified that while he did not drink Natural Ice—the beer found in the wrecked F-150—Smith drank it "like water" and would drink at work on a regular basis. (June 28, 2021 Tr. at 264-265). Pratt testified that other substances were consumed on the premises of Gardenscape, including marijuana and methamphetamine. (June 28, 2021 Tr. at 273).

{¶18} At the close of the State's evidence, Smith moved for a judgment of acquittal under Crim.R. 29. Smith argued Trooper Foster improperly opined

regarding his blood alcohol concentration based solely on observations made during the HGN and VGN tests and that the State consequently failed to present evidence sufficient to show that he was under the influence of alcohol. The trial court overruled Smith's Crim.R. 29 motion, after which Smith rested without presenting any evidence.

{¶19} On June 29, 2021, the jury found Smith guilty on all four counts as charged in the indictment. The trial court accepted the jury's verdicts and continued Smith's sentencing pending completion of a presentence investigation report.

{¶20} Smith's sentencing hearing was held on August 25, 2021. At the hearing, the trial court determined that Smith's aggravated vehicular assault and vehicular assault offenses merged for purposes of sentencing. The State elected to have the trial court sentence Smith for the aggravated vehicular assault. Thereafter, the trial court sentenced Smith to 36 months in prison for OVI, 8-12 years in prison for aggravated vehicular assault, and 18 months in prison for failure to stop after an accident. The trial court further ordered that all these sentences be served consecutively for an aggregate minimum term of 12.5 years in prison and an aggregate maximum term of 16.5 years in prison. The trial court filed its judgment entry of sentence on August 30, 2021.

## II. Assignments of Error

{¶21} On September 16, 2021, Smith filed a notice of appeal. He raises the following seven assignments of error for our review:

**1. Mr. Smith's conviction was not supported by sufficient evidence.**

**2. Mr. Smith's conviction was against the manifest weight of the evidence.**

**3. The trial court erred in denying Mr. Smith's Rule 29 motion for acquittal.**

**4. Mr. Smith was denied the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

**5. The State of Ohio improperly introduced expert testimony from Sgt. McClain to the prejudice of Mr. Smith and deprived him of his right to a fair trial.**

**6. Mr. Smith was denied his Sixth Amendment right to confrontation when the trial court declared Renee Mast an unavailable witness and permitted her written statement to be introduced into evidence.**

**7. The trial court erred in imposing an indefinite term as the Reagan Tokes Law violated Mr. Smith's constitutional right to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section Ten of the Ohio Constitution.**

We will consider Smith's assignments of error out of the order presented, and we will jointly consider some of his assignments of error where appropriate.

### III. Discussion

**A.    First & Third Assignments of Error:  Did the trial court err by denying Smith's Crim.R. 29 motion for acquittal and are Smith's convictions supported by sufficient evidence?**

{¶22} In his first and third assignments of error, Smith argues that his convictions are not supported by sufficient evidence.  Specifically, Smith maintains that the State "failed to prove beyond a reasonable doubt that [he] operated a motor vehicle, operated a motor vehicle while under the influence, was involved in an accident, and fled the scene thereafter."  He further contends that the State's evidence "was insufficient to establish that [he] was impaired beyond a reasonable doubt at the time of the accident."  Thus, Smith's arguments focus solely on the purported inadequacy of the State's evidence identifying him as the driver of the F-150 and establishing his impairment at the time of the crash.  He does not argue that the State's evidence is insufficient to support the other elements of the offenses of which he was found guilty.

**i. Sufficiency-of-the-Evidence Review & Crim.R. 29**

{¶23} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional*

*amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

{¶24} Pursuant to Crim.R. 29(A), "[t]he court on motion of a defendant * * *, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * *, if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because the purpose of a Crim.R. 29 motion for acquittal 'is to test the sufficiency of the evidence presented at trial,' we 'review[] a denial of a Crim.R. 29 motion for judgment of acquittal using the same standard that is used to review a sufficiency of the evidence claim.'" (Bracketing in original.) *State v. Brown*, 3d Dist. Allen No. 1-19-61, 2020-Ohio-3614, ¶ 35, quoting *State v. Willis*, 12th Dist. Butler No. CA2009-10-270, 2010-Ohio-4404, ¶ 9.

**ii. The State's evidence is sufficient to demonstrate that Smith was operating the F-150 at the time of the crash on March 7, 2019.**

**{¶25}** Smith first maintains that the State's evidence is insufficient to establish his identity as the driver of the F-150 at the time of the crash. We disagree. Pratt testified the F-150 had been in Smith's possession for at least one week prior to March 7, 2019, and Lyle's testimony supports that the truck may have been with Smith for closer to two weeks. Per Lyle's testimony, the F-150 was still in Smith's possession on the evening before the crash, and Lyle did not see anyone other than Smith with the F-150 at that time. Indeed, Pratt testified he had last seen the F-150 on or about March 5, 2019. Although Smith was not seen at the site of the crash, Stecher's canine tracked the F-150's driver's scent to Bennett's driveway, where Bennett reported seeing an unfamiliar white car. Neither Bennett nor any law enforcement officer observed Smith in or around Bennett's driveway, but Mast, who according to Sergeant Moser drove a white Buick matching the general description of the vehicle Bennett saw in her driveway, indicated in her statement that she had picked Smith up "off of the back road" and "pulled into the driveway." When Sergeant McClain inventoried the F-150, he found a cooler containing seven cans of Natural Ice—a beer that, according to Pratt's testimony, Pratt did not drink but that Smith drank "like water." In addition, when looking through the F-150, Sergeant McClain noted the airbag had deployed, and when he later spoke to Smith, he observed a mark on Smith's forehead that, in Sergeant McClain's opinion, was

consistent with having been caused by deployment of an airbag. Finally, and critically, Pratt testified that Smith, apparently unprompted, admitted he drove the F-150 on the morning of March 7, 2019, was involved in a collision, and fled the crash scene. Mast's statement echoed Pratt's account insofar as she reported overhearing Smith's unidentified friend tell Smith that he would have "just hit the deer instead of went [sic] left of center."

**{¶26}** We are cognizant that some of the evidence in the record, such as Smith's timecard or Mast's statement that she picked Smith up at approximately 5:30 a.m., could conceivably support a conclusion that Smith was not driving the F-150 when it struck Huepenbecker's vehicle a few minutes before 6:00 a.m. We are also aware of certain tensions in the evidence, such as between Mast's statement that she "pulled into the driveway" when she picked Smith up around 5:30 a.m. and Bennett's statement that she saw the unfamiliar white car in her driveway closer to 7:00 a.m., that the jury needed to reconcile to find that Smith was driving the F-150 at the time of the crash. But at this juncture, we are not tasked with evaluating the reasonableness of the jury's resolution of these evidentiary issues. Consideration of these matters is not appropriate when assessing the sufficiency of the State's evidence, where the relevant question is "not whether the state's evidence is to be believed, but whether, if believed, the evidence against [the] defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook,

Case No. 4-21-10

J., concurring). Here, the State's evidence, if resolved in its favor and believed by the jury, is more than sufficient to demonstrate that Smith was driving the F-150 at the time of the collision with Huepenbecker's vehicle on the morning of March 7, 2019.

**iii. The evidence is sufficient to prove that Smith was under the influence of alcohol at the time of the crash on March 7, 2019.**

{¶27} Of the offenses of which Smith was convicted, two of them—OVI and aggravated vehicular assault—required proof that he was impaired by alcohol at the time of the collision with Huepenbecker's vehicle. OVI offenses are codified at R.C. 4511.19, which provides in relevant part that "[n]o person shall operate any vehicle, streetcar, or trackless trolley * * *, if, at the time of the operation, * * *[t]he person is under the influence of alcohol * * *." R.C. 4511.19(A)(1)(a). The offense of aggravated vehicular assault is codified at R.C. 2903.08(A)(1), which provides in relevant part that "[n]o person, while operating or participating in the operation of a motor vehicle, * * * shall cause serious physical harm to another person * * * [a]s the proximate result of committing a violation of [R.C. 4511.19(A)] * * *." R.C. 2903.08(A)(1)(a). Thus, to sustain convictions for both OVI and aggravated vehicular assault in this case, the State needed to introduce evidence sufficient to prove that Smith was "under the influence of alcohol" at the time of the crash.

{¶28} With respect to alcohol consumption, "under the influence" has been defined as

-21-

> "[t]he condition in which a person finds himself after having consumed some intoxicating beverage in such quantity that its effect on him adversely affects his actions, reactions, conduct, movement or mental processes or impairs his reactions to an appreciable degree, thereby lessening his ability to operate a motor vehicle."

(Bracketing in original.) *State v. Carozza*, 5th Dist. Ashland No. 14-COA-028, 2015-Ohio-1783, ¶ 22, quoting *Toledo v. Starks*, 25 Ohio App.2d 162, 166 (6th Dist.1971). "'Under the influence' means that the accused consumed some intoxicating beverage, in such a quantity 'whether small or great' that adversely affected the accused's ability to operate a vehicle." *Cleveland v. Martin*, 8th Dist. Cuyahoga No. 105420, 2018-Ohio-740, ¶ 20.

{¶29} In arguing that the State presented insufficient evidence to show that he was under the influence of alcohol at the time of the crash, Smith claims that the State's evidence was limited to Sergeant McClain's and Trooper Foster's observations of his physical characteristics and demeanor hours after the crash and to Trooper Foster's conclusions based on the results of the HGN and VGN tests. Smith maintains that the latter evidence could not be used to sustain a finding that he was under the influence of alcohol because Trooper Foster did not testify to "the specific administration of the test[s]" and because Trooper Foster was "impermissibly allowed to testify that [his] BAC was somewhere between .08 and .17." Smith contends that Trooper Foster's testimony was "problematic considering the HGN [and VGN] test[s] [were] the only test[s] conducted and [were] conducted

more than five hours after the [crash]." According to Smith, the tests might have demonstrated that he was under the influence at the time they were administered, but they had "no correlation as to whether [he] was impaired by alcohol at 5:55 a.m. at the time of the accident."

{¶30} To support his argument, Smith cites *State v. Bresson*, 51 Ohio St.3d 123 (1990), where the Supreme Court of Ohio considered the admissibility of HGN test results in OVI prosecutions.[1] In *Bresson*, the court concluded that the "results of [an HGN] test are admissible so long as the proper foundation has been shown both as to the officer's training and ability to administer the test and as to the actual technique used by the officer in administering the test." *Id.* at 128. The court held that "[a] properly qualified officer may testify at trial regarding a driver's performance on the [HGN] test as it pertains to * * * whether the driver was operating a vehicle while under the influence of alcohol." *Id.* at syllabus. However, the court concluded that "such testimony may not be admitted to show what the exact alcohol concentration level of the driver was * * *." *Id.*

{¶31} Having reviewed Trooper Foster's testimony, we disagree with Smith's assertion that Trooper Foster did not testify to the technique he used when

---

[1] In *Bresson*, the court dealt only with the admissibility of testimony regarding the results of HGN testing. The court did not discuss VGN testing or the admissibility of VGN test results in OVI prosecutions. For purposes of this opinion, we assume that the court's reasoning in *Bresson* can be extended to VGN test results and that VGN test results are admissible to the same extent and for the same purposes as HGN test results. However, we expressly decline to decide these issues and reserve their final resolution for a proper case.

administering the HGN test. While Trooper Foster did not go into great detail about the particular HGN test administered to Smith, he exhaustively described the standard HGN testing procedures and indicated that Smith's HGN test was administered in accordance with those procedures. (*See* June 28, 2021 Tr. at 156-165, 169-170). And while Trooper Foster did not offer any detailed testimony about his technique in administering the VGN test, that is ultimately not problematic in this case as Trooper Foster detected no additional indicators of impairment via the VGN test.

{¶32} However, some of Smith's complaints about Trooper Foster's testimony are not entirely unreasonable. Trooper Foster's testimony about Smith's blood alcohol concentration being between .08 and .17 certainly skirted the line of what is permissible under *Bresson*. Nevertheless, Trooper Foster's testimony was arguably consistent with *Bresson* insofar as Trooper Foster did not testify to Smith's *exact* blood alcohol concentration and this case involved an "under-the-influence" OVI rather than a "per se" OVI that would have required evidence of Smith's blood alcohol concentration. *See State v. Banks*, 2d Dist. Greene No. 2014-CA-11, 2014-Ohio-5360, ¶ 25-26; *State v. Robertson*, 5th Dist. Richland No. 11CA0046, 2012-Ohio-2955, ¶ 44; *State v. Cole*, 3d Dist. Wyandot No. 16-94-11, 1995 WL 551110, *3 (Sept. 13, 1995).

**{¶33}** But regardless, the admissibility of the HGN and VGN test results is immaterial to determining whether the State presented sufficient evidence: "When conducting a sufficiency of the evidence analysis, [the] court is to look at the actual evidence admitted at trial, both admissible and inadmissible." *State v. Daniels*, 11th Dist. Trumbull No. 2020-T-0022, 2021-Ohio-790, ¶ 103. Irrespective of its admissibility, Trooper Foster's opinion regarding Smith's blood alcohol concentration unquestionably supports that Smith was under the influence of alcohol at the time the HGN and VGN tests were administered. Moreover, Trooper Foster's testimony that Smith's performance on the HGN test led him to conclude that Smith was under the influence—testimony that was clearly admissible under *Bresson*—lends additional support for a conclusion that Smith was intoxicated when the HGN test was administered. Smith's inebriation at that point in time is further evidenced by Sergeant McClain's and Trooper Foster's observations that Smith smelled like alcohol, had glassy and bloodshot eyes, and was speaking slowly.

**{¶34}** Yet, the question in this case is not whether the evidence is sufficient to show that Smith was under the influence of alcohol at the time Sergeant McClain and Trooper Foster first encountered him during the 11 o'clock hour on the morning of March 7, 2019. Instead, the question in this case is whether there is sufficient evidence that Smith was under the influence of alcohol more than five hours earlier when the F-150 collided with Huepenbecker's vehicle. The evidence of Smith's

impairment during the 11 o'clock hour might be relevant to answering that question. The jury was free to draw any reasonable inferences from Smith's impairment five hours after the crash.

**{¶35}** We find the State presented evidence sufficient to establish an inference that Smith's apparent intoxication during the 11 o'clock hour was merely a continuation of his early-morning intoxication. The fact that the F-150 struck Huepenbecker's vehicle in the manner that it did is itself some evidence that Smith was impaired at the time of the crash. *See State v. Miller*, 9th Dist. Summit No. 29469, 2020-Ohio-1209, ¶ 9 and 16. So too was Smith's flight from the crash scene at least some evidence of impairment because his flight could support an additional inference indicative of a consciousness of guilt. *See State v. Sanford*, 9th Dist. Lorain No. 18CA011308, 2021-Ohio-1619, ¶ 24; *State v. Gindlesperger*, 8th Dist. Cuyahoga No. 104539, 2017-Ohio-7478, ¶ 28 and 36-40. In addition, when Sergeant McClain entered the F-150, he found numerous cans of beer. Although many of the beer cans were full and little is known about the empty cans Sergeant McClain discovered, the presence of these cans adds support for a conclusion that Smith was under the influence of alcohol while he was driving the F-150. Furthermore, while Pratt testified that he could not smell alcohol on Smith's person, Pratt's observations that Smith was "holding himself" and walking a little bit "funny"—observations that were made within an hour or so of the crash—also

provide some support for concluding that Smith was under the influence at the time of the crash. This is so notwithstanding that Pratt could not rule out that Smith was acting that way due to injuries from the crash. Finally, Mast indicated in her statement that when she picked Smith up in the early-morning hours of March 7, 2019, he smelled like alcohol, and she believed he was still drunk from the previous evening. Therefore, viewing all the evidence in a light most favorable to the State, we conclude that the State presented evidence sufficient to prove beyond a reasonable doubt that Smith was under the influence of alcohol at the time of the crash.

{¶36} Smith's first and third assignments of error are overruled.

**B. Fifth Assignment of Error: Did the trial court commit plain error by allowing Sergeant McClain to offer an opinion regarding the cause of the abrasion he observed on Smith's forehead?**

{¶37} In his fifth assignment of error, Smith argues that the trial court erred by allowing Sergeant McClain to testify that the abrasion he observed on Smith's forehead on March 7, 2019, was "consistent with airbag deployment." Smith claims that, in this respect, Sergeant McClain was testifying as an expert witness, which was inappropriate because the State did not produce evidence establishing Sergeant McClain's qualifications to provide expert opinion testimony regarding the abrasion. Smith also maintains that Sergeant McClain should not have been

permitted to offer this testimony because the State did not provide notice that Sergeant McClain would be offering an expert opinion.

**i. Standard of Review**

{¶38} Ordinarily, trial court decisions regarding the admission of testimony, including expert opinion testimony, are reviewed for abuse of discretion. *State v. Haskell*, 3d Dist. Wyandot No. 16-15-03, 2015-Ohio-3095, ¶ 26; *State v. Burks*, 3d Dist. Shelby No. 17-10-27, 2011-Ohio-3529, ¶ 22. However, because Smith failed at trial to object to Sergeant McClain's testimony, he has forfeited all but plain error. *See State v. Fetherolf*, 3d Dist. Union Nos. 14-16-10 and 14-16-11, 2017-Ohio-1316, ¶ 30.

{¶39} For plain error to apply, the trial court must have deviated from a legal rule, the error must be plain, i.e., an obvious defect in the proceeding, and the error must have affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "[T]o demonstrate that the trial court's error affected a substantial right, the defendant must establish that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise." *State v. Sutton*, 3d Dist. Seneca No. 13-21-11, 2022-Ohio-2452, ¶ 50. We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**ii. The trial court did not commit plain error by allowing Sergeant McClain to opine regarding the cause of the abrasion on Smith's forehead.**

**{¶40}** Smith's argument, i.e., that the trial court erred by allowing Sergeant McClain to testify that the abrasion on Smith's forehead was "consistent with airbag deployment," is dependent on Sergeant McClain's testimony being expert opinion testimony, rather than the testimony of a lay witness. For a witness to offer an expert opinion, the following conditions must be satisfied: (1) the witness's testimony must "either relate[] to matters beyond the knowledge or experience possessed by lay persons or dispel[] a misconception common among lay persons"; (2) the witness must be "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony"; and (3) the witness's testimony must be "based on reliable scientific, technical, or other specialized information." Evid.R. 702. However, if the witness is testifying not as an expert witness but as a lay witness:

> [T]he witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Evid.R. 701.

**{¶41}** "The distinction between lay and expert witness opinion testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered

only by specialists in the field.'" *State v. McKee*, 91 Ohio St.3d 292, 297 (2001), fn. 2, quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn.1992). But "[t]he line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always easy to draw." *State v. Ndao*, 2d Dist. Montgomery No. 27368, 2017-Ohio-8422, ¶ 25, quoting *Hetzer-Young v. Elano Corp.*, 2d Dist. Greene No. 2015-CA-38, 2016-Ohio-3356, ¶ 43. Indeed, in some cases "courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *McKee* at 296.

> Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of [Evid.R. 701's] requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

(Footnote omitted.) *Id.* at 297. "Thus, courts across Ohio have allowed police officers, as lay witnesses, to offer opinions if such testimony meets the requirements of Evid.R. 701." *State v. Duncan*, 3d Dist. Allen No. 1-19-75, 2020-Ohio-3916, ¶ 9.

{¶42} Even assuming that Sergeant McClain could not testify as an expert regarding the abrasion he observed on Smith's forehead, if his testimony satisfied the requirements of Evid.R. 701, it would nevertheless be admissible lay opinion

testimony. At trial, Sergeant McClain testified that he has worked for OSHP for 31 years, 22 years of which he has served as a sergeant. (June 28, 2021 Tr. at 126-127). He stated that although he does not respond to as many vehicular crashes as he did when he began working for OSHP, he still responds to between 30 and 50 crash scenes every year. (June 28, 2021 Tr. at 126-127). He also testified he had responded to many crash scenes where the airbags had deployed inside the involved vehicles. (June 28, 2021 Tr. at 142). Sergeant McClain further stated he has specialized training in the area of crash response and investigation and that his training was up to date. (June 28, 2021 Tr. at 127-128). After reviewing his background, Sergeant McClain then stated that, in his opinion as informed by his experience with crashes where there was airbag deployment, the abrasion on Smith's forehead "would be consistent with airbag deployment." (June 28, 2021 Tr. at 142).

{¶43} Here, the record indicates that Sergeant McClain's opinion was rationally based on his own perceptions of Smith, as interpreted through the lens of his extensive experience with vehicular crashes and the aftermath of airbag deployment. Moreover, Sergeant McClain's opinion was helpful to the jury in determining whether Smith was driving the F-150 at the time of the crash, which was clearly a fact in issue. Under similar circumstances, courts have permitted law enforcement officers to offer lay opinion testimony regarding the cause of an

observed injury or the injury's consistency with its purported cause. *E.g.*, *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 75 (officer properly testified as lay witness regarding lacerations observed on defendant's hands during booking); *State v. Orlandi*, 10th Dist. Franklin No. 05AP-917, 2006-Ohio-6039, ¶ 20 (based on his personal and professional experience, officer could properly give lay opinion that scar was consistent with being kicked by the heel of a boot); *State v. Coit*, 10th Dist. Franklin No. 02AP-475, 2002-Ohio-7356, ¶ 39-40 (experienced law enforcement officer could opine as lay witness that the cuts on the victim's leg were consistent with being hit by a brick); *State v. Parker*, 2d Dist. Montgomery No. 18926, 2002-Ohio-3920, ¶ 53 (detective's opinion that victim's wounds were gunshot wounds was permissible as an opinion based on her perception and experience as a police officer). Therefore, as Sergeant McClain's testimony was admissible as the opinion of a lay witness, the trial court did not commit error, let alone plain error, by allowing his testimony.

{¶44} Smith's fifth assignment of error is overruled.

## C. Sixth Assignment of Error: By admitting Mast's statement, did the trial court violate Smith's Sixth Amendment right of confrontation?

{¶45} In his sixth assignment of error, Smith argues that the trial court erred by admitting Mast's statement under the forfeiture by wrongdoing exception. Smith maintains that the trial court should not have admitted Mast's statement because the State, as the proponent of Mast's statement, failed to prove that Mast was

unavailable as required to admit her statement. He claims that the admission of Mast's statement violated his Sixth Amendment right to confront Mast concerning the contents of her statement.

**i. Applicable Law & Standard of Review**

{¶46} "Although evidentiary decisions on hearsay are typically reviewed for an abuse of discretion, courts are instructed to 'review de novo evidentiary rulings that implicate the Confrontation Clause.'" *State v. Artis*, 3d Dist. Logan No. 8-18-40, 2019-Ohio-2070, ¶ 16, quoting *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97.

{¶47} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354 (2004).

{¶48} The first question in determining whether a defendant's right to confrontation has been violated is frequently whether the statement of the non-appearing witness is testimonial in nature. "[T]estimonial statements are those made for 'a primary purpose of creating an out-of-court substitute for trial

testimony.'" *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143 (2011). Where a statement is made during a police interrogation, the statement is testimonial "when the circumstances objectively indicate that there is no * * * ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266 (2006). In contrast, a statement made to police during an interrogation is nontestimonial if the "circumstances objectively indicat[e] that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* "Only testimonial hearsay implicates the Confrontation Clause." *McKelton* at ¶ 185. "If the statement is nontestimonial, it is merely subject to the regular admissibility requirements of the hearsay rules." *State v. Peeples*, 7th Dist. Mahoning No. 07 MA 212, 2009-Ohio-1198, ¶ 19.

{¶49} Although the Confrontation Clause generally bars the admission of an unavailable witness's testimonial statement if the defendant did not have a prior opportunity to cross-examine the witness regarding their statement, such a statement "may nevertheless be admissible under one of the two historical exceptions to the Confrontation Clause recognized by the U.S. Supreme Court—forfeiture by wrongdoing and dying declarations." *Artis*, 2019-Ohio-2070, at ¶ 14. The exception relevant here is forfeiture by wrongdoing. "[W]hen defendants seek to

undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce." *Davis* at 833. Defendants do not have a duty to assist the State in proving their guilt, but they do have a duty not to impair the integrity of the criminal-trial system. *Id.* When a defendant does so by obtaining the absence of a witness through wrongdoing, the defendant "forfeits the constitutional right to confrontation." *Id.* Thus, the doctrine of forfeiture by wrongdoing "extinguishes confrontation claims on essentially equitable grounds." *Crawford* at 62.

{¶50} The common-law doctrine of forfeiture by wrongdoing is codified in Evid.R. 804(B)(6). *See Giles v. California*, 554 U.S. 353, 367, 128 S.Ct. 2678 (2008) (explaining that Fed.R.Evid. 804(b)(6) codified the forfeiture doctrine); 2001 Staff Notes, Evid.R. 804(B)(6) (explaining that Evid.R. 804(B)(6) is "patterned on the federal rule" and "codifies a principle that has been recognized at common-law in Ohio"). Evid.R. 804(B)(6) provides:

> (B) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> * * *
>
> (6) Forfeiture by Wrongdoing. A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying. However, a statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide

the adverse party a fair opportunity to contest the admissibility of the statement.

**{¶51}** For a witness's statement to be admitted under the forfeiture by wrongdoing exception, "the State must show by a preponderance of the evidence: (1) the defendant's wrongdoing resulted in the witness's unavailability and (2) one purpose was to cause the witness to be unavailable at trial." *Artis* at ¶ 16. The forfeiture rule applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying." (Emphasis sic.) *Giles* at 359. However, the State need not establish that the defendant was motivated solely by a desire to stop the witness from testifying. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 90. Rather, it is enough for the State to show that the defendant "'was motivated *in part* by a desire to silence the witness.'" (Emphasis sic.) *Id.*, quoting *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir.1996).

## ii. The Trial Court's Findings Regarding Unavailability & Admissibility

**{¶52}** On the first day of Smith's trial, June 28, 2021, the State presented the testimony of several witnesses, after which it requested a short recess to address an issue regarding the unavailability of Mast as a witness. Following an off-the-record in-chambers discussion, the trial court stated on the record that "the State indicated in chambers that they intended to call Ms. [Mast] as a witness * * * and had her served with the subpoena to require her attendance beginning at 11:00 o'clock today," but that Mast failed to appear as commanded by the subpoena. (June 28,

2021 Tr. at 204).  Indeed, the record reflects that on May 4, 2021, the State issued a subpoena requiring Mast to appear in court at 11:00 a.m. on June 28, 2021, and that Mast was personally served with the subpoena at a Defiance-area address on May 7, 2021.  (Doc. No. 47).

{¶53} The trial court, the prosecutor, and Smith's trial counsel then engaged in the following dialogue:

| | |
|---|---|
| [Trial Court]: | After further discussion with counsel in chambers and review of the hearsay rules, the Court has also been made aware that the State is possessed of a written statement provided by Ms. Mast to law enforcement and that the State in her absence is seeking to admit that statement. |
| [Prosecutor]: | That's correct, Your Honor. |
| [Trial Court]: | It is further my understanding between discussion with both State and defense counsel in chambers that there exist certain recorded telephone conversations from the Corrections Center of Northwest Ohio [("CCNO")] between [Smith] and this witness. |
| [Prosecutor]: | Correct. |
| [Trial Counsel]: | That's correct, Your Honor. |
| [Trial Court]: | And the substance of those conversations were represented by the State and * * * what's the substance of those conversations * * *? |
| [Prosecutor]: | Thank you, Your Honor.  It has to deal with two different conversations that took place.  The first conversation that took place involved this Defendant Loren Smith and Ms. Mast.  Mr. Smith had contacted Ms. Mast; he had just gotten off the phone |

with his mother wherein they had discussed a conversation that took place between [Smith's trial counsel] and Ms. Mast regarding her testimony and certain aspects of that testimony. Mr. Smith began to aggressively confront Ms. Mast about that testimony, about how she needs to keep it simple and plead the Fifth with regards to that. The next phone conversation that took place it's indicating that Ms. Mast had intentions of leaving the area, she indicated that she was going to be burning all her stuff and packing her bags and she was going to gone [sic]. She made comments that if you go down, I'm going to go down with you, and to the like. At this time, we would ask the Court to consider her unavailable, declarant at this time.

[Trial Court]: First of all, with regard to those conversations, those are from CCNO and are recorded?

[Prosecutor]: Correct and they have been provided to [Smith's trial counsel].

[Trial Court]: And [Smith's trial counsel] you've had an opportunity to hear those conversations.

[Trial Counsel]: I did Your Honor and I did review those yesterday.

[Trial Court]: Okay. I could either have them played but are those based on – I'm obviously soliciting professional statements from both counsel, but are those a fair characterization of the conversations?

[Trial Counsel]: That would be fair Your Honor, and no need to play those recordings.

(June 28, 2021 Tr. at 204-206). The CCNO recordings are not in the record, and it cannot be determined from this dialogue when these telephone conversations took place or when exactly the State became aware of them. However, on the morning

-38-

of the first day of trial, Monday, June 28, 2021, the State filed two supplemental discovery responses indicating that several telephone conversations had been provided to Smith, including a "6/24/21 MAST/SMITH CCNO Phone Call," a "6/24/21 SMITH CCNO Phone Call," and a "SMITH/MAST CCNO Phone Call." (Doc. Nos. 58, 59). From this additional discovery, it appears the earliest call was made on Thursday, June 24, 2021, just four days prior to the start of the trial.[2] The proofs of service on the State's supplemental responses indicated that the telephone conversations had been provided to Smith's trial counsel on Sunday, June 27, 2021. (Doc. Nos. 58, 59).

{¶54} Based on the State's representations and Smith's agreement to the characterization of the phone calls, the trial court found "by preponderance of the evidence that [Smith] procured the unavailability, under the rules of evidence, procured the unavailability of [Mast] and that the statement would therefore be admissible on that basis." (June 28, 2021 Tr. at 206-207). The trial court then observed:

> Counsel have also in chambers made the Court aware of the content of the statement that they seek to admit, wherein Ms. Mast in that statement indicates her belief that she may have personal criminal

---

[2] In its appellate brief, the State asserts the wrongdoing occurred on Sunday, June 27, 2021, just prior to trial. (Appellee's Brief at 20). While this assertion may explain the State's apparent lack of additional efforts to obtain Mast's presence at trial, we are bound to consider only what is in the record before us. The State did not have the recordings made a part of the record for our consideration and defense counsel specifically advised the trial court it was unnecessary to play the phone calls on the record. Although the situation regarding Mast's failing to appear arose in the midst of trial during the State's presentation of evidence, both parties would have been better served if a more deliberate effort had been made to create a complete record for appellate review.

> responsibility for assisting [Smith] in connection with this entire situation. That being the case, under the hearsay exception, * * * the witness being unavailable insofar as she's refused to comply with the duly served subpoena, based on her unavailability that statement would be admissible under * * * [Evid.R. 804(B)(3)] as a statement against penal or pecuniary interest because it's clearly from the content of the statement given against her potential penal interest. So, the statement would be admissible based on forfeiture and the defendant procuring her [un]availability. If it were not for whatever reason available to be admitted under that, it would be admissible under a declarant unavailable statement against pecuniary or penal interest. So, in either legal basis that statement would be admissible.

(June 28, 2021 Tr. at 207).

{¶55} Smith's trial counsel then objected to the admission of Mast's statement specifically "on Sixth Amendment grounds with not being able to confront [her] in regards to her testimony regarding that statement." (June 28, 2021 Tr. at 208). The trial court overruled the objection. (June 28, 2021 Tr. at 208). The trial court then addressed the matter of Mast's potential appearance for the second day of trial on June 29, 2021. The trial court noted that Smith "had [Mast] served with a subpoena for tomorrow morning as well." (June 28, 2021 Tr. at 208). The record reflects that on June 17, 2021, Smith issued a subpoena requiring Mast to appear in court at 9:00 a.m. on June 29, 2021, and that Mast was personally served with the subpoena just a week earlier on June 21, 2021, at the same Defiance-area address. (Doc. No. 52). The trial court indicated that if Mast appeared on Smith's subpoena, her statement "could be addressed either through cross-examination of her if called as a witness for the defense or on rebuttal * * * if she appear[ed]

pursuant to his subpoena having ignored your subpoena." (June 28, 2021 Tr. at 209). From the record, it does not appear that Mast attended the second day of trial.

**iii. The trial court did not err by admitting Mast's statement because her statement was admissible under the forfeiture by wrongdoing exception.**

{¶56} Initially, we find that Mast's statement to Sergeant Moser was testimonial. Mast made her statement to Sergeant Moser on March 15, 2019—more than a week after the crash. By this time, law enforcement officers were not faced with an ongoing emergency that Mast's statement could have helped them resolve. Furthermore, based on the contents of the statement, the questions Sergeant Moser posed to Mast, and the setting in which the statement was given, it is evident that the primary purpose of Sergeant Moser's questioning was to gather Mast's recollections of past events potentially relevant to a later criminal prosecution of Smith and to establishing his criminal culpability. Thus, Mast's statement to Sergeant Moser was clearly testimonial in nature. Moreover, there is nothing in the record suggesting that Smith had a prior opportunity to cross-examine Mast regarding the contents of her statement. Consequently, Mast's statement was inadmissible under the Confrontation Clause unless the forfeiture by wrongdoing exception applied.[3]

---

[3] We note that while the trial court relied on the statement against penal interest hearsay exception contained in Evid.R. 804(B)(3) as an alternative to admit Mast's statement, under the circumstances, Evid.R. 804(B)(3) could not have served as a separate and sufficient basis to admit Mast's statement. Under *Crawford*, unconfronted testimonial statements like Mast's "are not subject to the exceptions to the hearsay rules." *Artis*, 2019-Ohio-2070, at ¶ 14. Instead, such statements are admissible only under the two longstanding historical exceptions recognized by the Supreme Court of the United States. *Id.* Although Evid.R. 804(B)(3) is an

**{¶57}** Turning to that critical matter, the record establishes that two of the requirements for application of the forfeiture by wrongdoing exception were easily satisfied. First, based on the prosecutor's reciting the nature of the phone calls between Smith and Mast and defense counsel's agreeing to their characterization, it is evident Smith engaged in wrongdoing when he "aggressively confront[ed]" Mast about her testimony and about the need for her to keep her testimony "simple and plead the Fifth with regards to that." *See Steele v. Taylor*, 684 F.2d 1193, 1201 (6th Cir.1982) (stating that "[w]rongful conduct" has been held to include "a defendant's direction to a witness to exercise the Fifth Amendment privilege"); *but see* 2001 Staff Notes, Evid.R. 804(B)(6) (stating that "[e]ncouraging a witness to invoke a valid privilege, such as the Fifth Amendment, * * * does not trigger [Evid.R. 804(B)(6)] because such conduct is not wrongdoing"). It is obvious that Smith's intent in engaging in this conduct was to render Mast unavailable to testify at his trial. Moreover, the second phone call evidences the success Smith had in keeping Mast from testifying as she stated her intentions to leave the area and be "gone."

**{¶58}** Thus, the sole remaining issue is whether the trial court erred in finding that Smith's wrongdoing resulted in Mast's unavailability as a witness. As defined in Evid.R. 804, "'[u]navailability as a witness' includes any of the following

---

exception to the rule against hearsay, it is not an exception to the Sixth Amendment's requirement that a defendant have the opportunity to confront a witness regarding their testimonial statements. Accordingly, because Mast's statement was testimonial in nature, it could only have been admitted under the forfeiture by wrongdoing exception.

situations in which the declarant * * * is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." Evid.R. 804(A)(5). In criminal cases, "[a] witness is not considered unavailable unless the prosecution has made reasonable efforts in good faith to secure his presence at trial." *State v. Keairns*, 9 Ohio St.3d 228, 230 (1984), citing *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318 (1968). "'The lengths to which the prosecution must go to produce a witness * * * is a question of reasonableness.'" *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531 (1980),[4] quoting *California v. Green*, 399 U.S. 149, 189, 90 S.Ct. 1930 (1970), fn. 22 (Harlan, J., concurring). When a witness does not appear at trial, "it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." (Internal citation omitted.) *Hardy v. Cross*, 565 U.S. 65, 71-72, 132 S.Ct. 490 (2011). Ultimately, what suffices as a reasonable, good-faith effort on the part of the prosecution varies depending on the facts and circumstances of each case. *State v. Tabor*, 12th Dist. Warren No. CA2011-07-076, 2012-Ohio-4642, ¶ 14.

{¶59} As the proponent of the evidence, "[t]he state has the burden of proving both that the witness is unavailable and that it made reasonable, good faith

---

[4] *Roberts* was abrogated in substantial part by *Crawford*, though on other grounds.

-43-

efforts to secure the witness's attendance." *State v. Parker*, 6th Dist. Lucas No. L-18-1238, 2020-Ohio-4607, ¶ 90. Although "testimony of witnesses rather than hearsay not under oath" is usually demanded of the State before its witness can be declared unavailable, the State may be relieved of this burden if "unavailability is conceded by the [defendant]." *Keairns* at paragraph three of the syllabus.

{¶60} Here, the State did not present any testimony to establish Mast's unavailability. Instead, the State pointed to (1) the subpoenas that had been served on Mast, (2) Smith's wrongdoing as evidenced in the recorded phone calls and conceded to by defense counsel, (3) Mast's statement that she had no intentions of attending or testifying at Smith's trial, and (4) her subsequent failure to appear. Under the particular circumstances of this case, where these points were conceded or not disputed by Smith's trial counsel, this was enough for the State to establish that Mast was unavailable and that Smith procured Mast's unavailability. First, in acknowledging that the State accurately represented the contents of the conversations between Smith and Mast, Smith's trial counsel effectively conceded that Mast was unavailable. Given that Mast clearly failed to appear upon her subpoena, Smith's trial counsel acceded to the State's request when he agreed that the State had accurately represented the contents of the conversations, which supported that Mast would not testify despite being served with the subpoenas. From the record, it appears the trial court and the State interpreted Smith's trial

counsel's concession as having this effect. Furthermore, Smith's trial counsel acquiesced to the fact that the State had made some reasonable good-faith effort to secure Mast's attendance insofar as he did not dispute that Mast had been served with the State's subpoena or challenge whether this was a reasonable effort to secure her attendance. *See State v. Bragg*, 2 Ohio App.3d 193, 195 (10th Dist.1981) (holding that several efforts to subpoena a witness at different addresses were indicative that the proponents of the witness's testimony had been unable to secure attendance of the witness by process). Significantly, at no time did Smith's attorney lodge an objection to the introduction of Mast's statement based specifically upon the State's failure to competently establish that she was unavailable.

{¶61} We are also mindful that Smith's wrongdoing occurred only days before the commencement of trial. Both counsel for Smith and the State had successfully subpoenaed Mast, who was scheduled to appear as a prosecution witness on the morning of the first day of trial. Thus, the court and counsel were reacting to Smith's wrongdoing as they learned the consequences of it by Mast's failure to appear.

{¶62} To be clear, determining whether the State sufficiently demonstrated Mast's unavailability would be more straightforward if the State had put on the record what it had done, other than serving its subpoena on Mast, to secure Mast's attendance at Smith's trial. In a particular case, the presence or absence of such

additional efforts might be determinative of whether the State made a reasonable good-faith effort to secure the witness's attendance and thus of whether the witness is truly unavailable. The need for such a demonstration may be intensified in a case where wrongdoing by the defendant was discovered well in advance of trial.

**{¶63}** In any event, given the specific facts of this case, where the wrongdoing was not learned of until the eve of trial, and especially considering Smith's trial counsel's agreement with or acquiescence to the bases of the State's request, we find the State made a reasonable good-faith effort to secure Mast's attendance. Therefore, it was not error for the trial court to declare Mast unavailable or for the trial court to conclude that Smith procured Mast's unavailability.

**{¶64}** Smith raises an additional argument for the first time on appeal objecting to the statement being admitted in violation of Evid.R. 804(B)(6)'s qualification that "a statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest the admissibility of the statement." However, because this argument was not raised in the trial court, we need not consider it on appeal.

> Arguments raised for the first time on appeal are generally barred. Such arguments are barred by the doctrine of waiver for failure to raise these arguments before the trial court. It is well-established that a party cannot raise any new issues or legal theories for the first time on appeal * * *. Litigants must not be permitted to

hold their arguments in reserve for appeal, thus evading the trial court process.

*State v. Crayton*, 3d Dist. Crawford No. 3-22-10, 2022-Ohio-3183, ¶ 10, quoting *State v. Talley*, 6th Dist. Lucas Nos. L-20-1131 and L-20-1132, 2021-Ohio-2558, ¶ 22, quoting *Cawley JV, L.L.C. v. Wall St. Recycling, L.L.C.*, 8th Dist. Cuyahoga No. 102121, 2015-Ohio-1846, ¶ 17.

{¶65} Additionally, we note that the statement was provided by the State in its response to Smith's discovery request. Because the impact of the wrongdoing was only discovered when Mast failed to comply with the mandate of her subpoena, there was no opportunity for the State to comply with the rule. Nevertheless, the record reflects that Smith did have an opportunity to contest the admissibility of the statement.

{¶66} Accordingly, we conclude that the trial court did not err by admitting Mast's written statement under the forfeiture by wrongdoing exception. Smith's sixth assignment of error is overruled.

**D. Second Assignment of Error: Are Smith's convictions against the manifest weight of the evidence?**

{¶67} In his second assignment of error, Smith argues that his convictions are against the manifest weight of the evidence. Specifically, Smith argues that the greater quantity of credible evidence established that he was already at the

Gardenscape facility by the time of the crash, thus making it impossible for him to have been driving the F-150 at the time it collided with Huepenbecker's vehicle.

### i. Standard for Manifest-Weight Review

{¶68} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

### ii. Smith's convictions are not against the manifest weight of the evidence.

{¶69} Smith argues that his convictions are against the manifest weight of the evidence because "[t]he record is filled with conflicting testimony, none of

which fits the [State's] timeline to suggest that [he] was operating the F-150 on March 7, 2019, at 5:55 a.m." To support his position, Smith points to Mast's statement, wherein she indicated that she had picked Smith up at 5:30 a.m. and drove him directly to work. He also notes that his timecard showed that he clocked into work at Gardenscape at 5:43 a.m., which was consistent with the timeline in Mast's statement. In addition, Smith relies on Pratt's testimony that he first saw Smith at around 6:35 a.m. Smith contends that if he "clocked into work at 5:43 a.m. and started fires that morning, it lines up with [Pratt's] testimony that he saw [Smith] around 6:35 a.m." Finally, Smith points to Bennett's testimony that she saw the white vehicle in her driveway between 7:00 and 7:30 a.m. Smith argues that Bennett's testimony "is inconsistent with [the State's] theory that it was [Mast's] vehicle in [Bennett's] driveway, and that she picked [Smith] up after the accident."

{¶70} We acknowledge the inconsistencies in some of the State's evidence. For example, if the State's theory—that Mast picked Smith up from Bennett's driveway shortly after the crash and drove him to work—is correct, the vehicle Bennett claimed to have observed in her driveway between 7:00 a.m. and 7:30 a.m. cannot have been Mast's vehicle. Similarly, Mast's claim that she picked Smith up at 5:30 a.m. is not compatible with the State's assertion that Smith crashed the F-150 into Huepenbecker's vehicle around 5:55 a.m. However, when assessing a witness's testimony or the statement of an out-of-court declarant, the finder of fact

"may take note of any inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony'" or statement. (Bracketing in original.) *State v. Carter*, 3d Dist. Allen Nos. 1-21-19 and 1-21-20, 2022-Ohio-1444, ¶ 97, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21. Thus, in considering Bennett's testimony, the jury could reasonably find that Bennett had in fact seen the unfamiliar white vehicle in her driveway but that she simply misremembered the time at which she saw it. Likewise, in evaluating Mast's statement, the jury could find that Mast was mistaken about the time at which she picked Smith up or that she was being untruthful, but that other parts of her statement were entirely credible. Similarly, it was within the province of the jury to reject Smith's claim that his timecard accurately reflected the time at which he arrived at Gardenscape and that he was not seen by his coworkers until slightly later in the morning because he had been outside starting fires under the conveyor belts. Indeed, the State's evidence permitted a determination by the jury that someone else had clocked Smith in or that the time clock had been manipulated.

**{¶71}** In light of the substantial evidence identifying Smith as the driver of the F-150, we cannot say that the jury lost its way by resolving any of these evidentiary inconsistencies in favor of the State. The State's evidence showed that Smith was still in possession of the F-150 on the evening of March 6, 2019, just hours before the crash. At this time, no one other than Smith was seen with the F-

Cold cans of Natural Ice—apparently one of Smith's beers of choice—were discovered inside of the F-150. The canine track from the F-150 led to Bennett's driveway, where Bennett reported seeing a vehicle that, according to Sergeant Moser, fit the general description of Mast's vehicle. Mast indicated in her statement that she "pulled into the driveway" when picking Smith up, thus supplying the missing link between Stecher's canine track and Bennett's observation of the white car in her driveway. Hours after the crash, Sergeant McClain observed a mark on Smith's forehead that, in Sergeant McClain's experience, was consistent with airbag deployment. The evidence showed that the F-150's airbag had deployed during the crash. Last, but certainly not least, Smith admitted to Pratt that he had crashed the F-150 into another vehicle and fled from the scene of the collision. Pratt's account of Smith's admission was echoed in Mast's statement insofar as Mast reported overhearing Smith's unidentified friend tell Smith that he would have "just hit the deer instead of went [sic] left of center."

{¶72} In sum, the State presented considerable evidence supporting that Smith was driving the F-150 at the time it collided with Huepenbecker's vehicle. Therefore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Smith's convictions must be reversed.

**{¶73}** Smith's second assignment of error is overruled.

**E. Fourth Assignment of Error: Did Smith receive ineffective assistance of counsel?**

**{¶74}** In his fourth assignment of error, Smith argues that he received ineffective assistance of counsel. Smith maintains that his trial counsel was ineffective for two reasons. First, Smith takes issue with his trial counsel's failure to object to parts of Pratt's testimony, specifically Pratt's testimony about what Smith said to him at Gardenscape on the morning of March 7, 2019, and Pratt's testimony about comments Lucas Manley—the other person who was working on the F-150—made that same morning. Smith argues that Pratt's testimony contained inadmissible hearsay, to which his trial counsel ought to have objected. In addition, Smith contends that his trial counsel was ineffective for failing to present an alibi defense. Smith notes that he had filed a notice of alibi indicating that John Smith ("John"), another Gardenscape employee, would be able to verify that he was at work at Gardenscape at the time of the crash, but that his trial counsel failed to call John to testify at trial.

**i. Ineffective-Assistance-of-Counsel Standard**

**{¶75}** "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1)

counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

{¶76} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**ii. Smith's trial counsel did not perform deficiently by failing to object to hearsay or purported hearsay.**

**{¶77}** Smith's first argument is that his trial counsel performed unreasonably by failing to object to Pratt's testimony that Smith told him that "he had swerved to miss a deer and hit a car head on, and * * * ran from the scene." Smith maintains that this alleged statement to Pratt constituted impermissible hearsay and that its admission prejudiced his defense. However, under Evid.R. 801(D)(2)(a), "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is * * * the party's own statement, in either an individual or a representative capacity * * *." Thus, "a defendant's own out-of-court statements are not generally considered hearsay when offered against him at trial." *State v. Heald*, 11th Dist. Lake Nos. 2021-L-111 and 2021-L-112, 2022-Ohio-2282, ¶ 15, citing *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 112. Accordingly, Pratt's recollections of what Smith supposedly said to him on the morning of March 7, 2019, do not qualify as hearsay.

**{¶78}** Smith further claims that his trial counsel performed deficiently by not objecting to Pratt's testimony concerning comments Manley purportedly made on the morning of March 7, 2019. At trial, Pratt testified that he knew Manley did not work on the F-150 on the evening of March 6, 2019, because he spoke to Manley between 5:30 a.m. and 6:00 a.m. on March 7, 2019, and Manley told him that he intended to work on the F-150 later that day after work. (June 28, 2021 Tr. at 257-258). Smith argues that Manley's statement was inadmissible hearsay and that it

"improperly bolstered [Pratt's] credibility and [the State's] theory that [Smith] was the only person who could have operated the F-150 on the morning of March 7, 2019."

**{¶79}** Yet, under Evid.R. 803, the rule against hearsay does not prohibit the introduction of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)," though statements "of memory or belief to prove the fact remembered or believed" remain generally inadmissible. Evid.R. 803(3). Manley's statement that he intended to do repairs on the F-150 later on March 7, 2019, supports an inference that the F-150 had not yet been fixed and returned to Pratt, thereby making it more likely that Smith was still in possession of the F-150 that morning. Pursuant to Evid.R. 803(3), Manley's statement, as expressed through Pratt, was not inadmissible hearsay.

**{¶80}** Therefore, Pratt's testimony regarding Smith's statement and Manley's statement was admissible under the Rules of Evidence. Consequently, even if Smith's trial counsel had objected to this testimony on the basis that it contained inadmissible hearsay, the objections would have been properly overruled. Given that any objections to this testimony would have been futile, Smith has failed to establish that his trial counsel performed deficiently by opting not to object. *See State v. Messenger*, 10th Dist. Franklin No. 19AP-879, 2021-Ohio-2044, ¶ 65-67.

### iii. Smith failed to demonstrate that his trial counsel performed deficiently in pursuing his alibi defense.

{¶81} Smith additionally claims that he was denied the effective assistance of counsel when his trial counsel "failed to issue a subpoena for John Smith's testimony at trial and failed to call him as a witness." But this is inaccurate. The record reflects that Smith's trial counsel issued a subpoena for John on June 17, 2021, though efforts to serve the subpoena on John proved unsuccessful. (Doc. No. 52). Smith does not argue, and the record does not contain evidence to support, that Smith's trial counsel would have been able to secure John's appearance at trial through means other than subpoena and that his trial counsel failed, without good reason, to use those means. Therefore, on this record, Smith has failed to demonstrate that his trial counsel performed deficiently by failing to present John's testimony at trial. Furthermore, in the absence of John's testimony, it was not unreasonable for Smith's trial counsel to ground Smith's defense in cross-examination of the State's witnesses and in highlighting certain parts of the State's evidence, such as Mast's statement that she picked Smith up at 5:30 a.m. and Smith's timecard, that were inconsistent with its theory of the case. Thus, although Smith's trial counsel did not exactly present an alibi defense, his testing of the State's case was structured in a way so as to suggest to the jury that Smith was at Gardenscape, and not in the F-150, at the time of the crash. Here too Smith has failed to establish that his trial counsel performed deficiently or unreasonably.

**{¶82}** Smith's fourth assignment of error is overruled.

**F. Seventh Assignment of Error: Were Smith's due-process rights violated when the trial court sentenced him to 8 to 12 years in prison for aggravated vehicular assault?**

**{¶83}** In his seventh assignment of error, Smith argues that the trial court erred by sentencing him to 8 to 12 years in prison for aggravated vehicular assault because the indefinite-sentencing provisions of the Reagan Tokes Law are unconstitutional. Specifically, Smith claims that these provisions violate his right to due process.

**{¶84}** Smith's challenge does not present a matter of first impression in this court. Since the indefinite-sentencing provisions of the Reagan Tokes Law went into effect in March 2019, we have repeatedly been asked to address the constitutionality of these provisions. We have invariably concluded that the indefinite-sentencing provisions of the Reagan Tokes Law do not infringe on defendants' due-process rights. *E.g.*, *State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547, ¶ 11; *State v. Wolfe*, 3d Dist. Union No. 14-21-16, 2022-Ohio-96, ¶ 21. Smith has not presented us with any compelling reason to depart from our earlier precedent on due-process challenges to the indefinite-sentencing provisions of the Reagan Tokes Law, and we decline to do so. Accordingly, we conclude that the trial court did not err by sentencing Smith to 8 to 12 years in prison for aggravated vehicular assault.

**{¶85}** Smith's seventh assignment of error is overruled.

## IV. Conclusion

**{¶86}** For the foregoing reasons, Smith's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Defiance County Court of Common Pleas.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**